BURTON R. PITTLER and ELIN PITTLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pittler v. Commissioner
Docket No. 12457-84.
United States Tax Court
T.C. Memo 1986-320; 1986 Tax Ct. Memo LEXIS 294; 51 T.C.M. (CCH) 1587; T.C.M. (RIA) 86320; July 28, 1986. John P. Kelly, for the petitioners. John O. Kent, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes of $7,630 in 1975 and $726 in 1976. After a concession by petitioners, the sole issue for decision [1] is whether the partnership Royal Kuhio XI engaged in bona fide transactions during the years in issue, which would give rise to deductible losses by petitioners as limited partners in the partnereship. *295 FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners were husband and wife and resided in Tarzana, California, at the time they filed their petition herein. Petitioners timely filed 1975 and 1976 joint Federal income tax returns with the Internal Revenue Service Center at Fresno, California. During the years in issue, petitioners were limited partners in a partnership, Royal Kuhio XI (RK-11). RK-11 was 1 of 49 real estate tax shelter partnerships promoted and sold by the Cal-Am Corporation in 1975. In 1975 and 1976, RK-11 purported to conduct certain real estate transactions for which it reported on its partnership returns for those years expenses in excess of income. Petitioners claimed deductions for their distributive share of the partnership losses on their 1975 and 1976 tax returns. The deductions were disallowed by respondent. Related Entities
The following entities were associated with the RK-11 transactions in issue: Cal-Am Corporation
(Cal-Am)
Legal Mortgage Corporation
(LMC)
Bio-Science Resources, Inc.
(BIO)
Go Publishing Company, Inc.
(GO)
Joseph R. Laird, A Professional
Corporation
(Laird Inc.)
Kenneth J. Fisher, Inc.
(Fisher Inc.)
*296 At all times relevant here, attorney Joseph R. Laird (Laird) was the president and Kenneth J. Fisher (Fisher) was the secretary, treasurer, and/or vice president of Cal-Am, LMC, BIO, and GO. Another officer of Cal-Am was Kenneth A. Yates (Yates). Laird was president of Laird Inc., and Fisher was president of Fisher Inc. Formation of RK-11
In 1975, under the direction and control of Laird and Fisher, Cal-Am distributed to select individuals Private Offering Memorandums to promote 49 real estate limited partnerships. The primary objective of the promotion was to encourage those individuals to invest in a limited partnership that would produce tax deductions primarily for interest. Petitioners received and read such a memorandum regarding RK-11. The RK-11 memorandum was dated November 1, 1975, and contained the following introductory statement: The Partnership will be formed for the purpose of acquiring condominium units and a parcel of undeveloped real property. The partnership will be financed from capital contributions made by limited partners, an option to purchase payment made by Legal Mortgage Corporation and a nonrecourse loan by K. J. Fisher, Inc. The purchase *297 of both the condominium units and the land will involve one year's prepayment of interest. In addition to the interest, 20 points will be paid to the seller of the condominiums in consideration of acceptance of a purchase money note providing for interest at 7 1/2% per annum and requiring installment payments over a period of 35 years. For the land, 25 points will be paid to the seller in consideration of a purchase money note providing for interest at 5.4% per annum and requiring installment payments over a period of 35 years. Following purchase, an option to purchase both the condominium units and the land parcel will be granted to Legal Mortgage Corporation in consideration of an option deposit (See: "Option to Purchase" - Page 4). In addition to the prepaid interest and loan points, the partnership will make payments for legal and set-up management for 1975 post-organizational services. It is expected that the partnership will operate at a loss for an indeterminate period. The partnership expenses during this period are to be paid from partnership receipts and additional nonrecourse loans from K. J. Fisher, Inc. or from funds of the General Partner. The partners are *298 required to make a loan to GO Publishing Company, Inc. of an amount equal to their capital contribution to the partnership. The loans by the partners to GO will be in each case evidenced by a note secured by a deed of trust. The note will provide for interest at 6% per annum accruing from January 1, 1976. GO will sell the condominium units to the partnership. BIO will sell the land parcels to the partnership. Legal Mortgage Corporation will have the option to purchase the partnership properties. Fisher, Inc. will make the initial nonrecourse loan and will be required to make further nonrecourse loans if and when necessary to carry out the partnership business. Laird, Inc. will receive a legal fee for post-organizational services. All of the above referred to corporations have a common control through Fisher and Laird. The partnership's investment policy was described in the memorandum as follows: "To create a sound real estate investment. To realize tax losses through deductions currently allowable under the Internal Revenue Code." A schedule in the memorandum included the following information: TAX WRITE-OFF: 1975
1976
1977 - 1980
Loan
$152,100
Interest (A.I.T.D.)
45,675
39,150
Interest (N.R.L.)
18,073
18,073
Operating Expense
2,100
6,300
Legal & Set-Up Management
12,960
2,000
2,000
Depreciation
6,400
6,400
Write-Off
$210,735
$28,573
$71,923
Partners Total Contributions
(Capital and Loans to GO) = $60,000
Write-Off per $1,000
$3,512
(Total Contributions)
Write-Off %
351%
Partners Total Capital Contributions =
30,000
Write-Off per $1,000
7,024
(Capital Contributions)
Write-Off %
702%
*299 Petitioners also received an Offeree Questionnaire, a Subscription Agreement, and a copy of the RK-11 Partnership Agreement. The Private Offering Memorandum and the Partnership Agreement described the condominiums to be purchased as follows: Royal Kuhio
Honolulu, Hawaii
Specific Units
1307, 1309, 1310
Petitioners completed the Offeree Questionnaire, which required personal and financial information, and on December 30, 1975, they executed the Subscription Agreement to become limited partners in RK-11. In that agreement, petitioners represented that, among other things, they received the Private Offering Memorandum and they accepted and adopted the Partnership Agreement. The signature page of the Subscription Agreement contained the following notations in bold type: The [condominium] units have not been registered under the Securities Act of 1933. Transfer or other disposition of the units is restricted and may not be made without an appropriate opinion of counsel. The condominium units will not be ready for occupancy until August, 1976. By letter dated December 30, 1975, Laird, as president of Cal-Am, notified petitioners that they were accepted *300 as subscribers to RK-11 and that their $6,000 contribution had been received. That payment, however, was in the form of a cashiers check to the order of Cal-Am and dated December 31, 1975. Also on December 30, similar letters were written to other investors in RK-11. On December 31, 1975, Certificates of Limited Partnership were filed for most of the 49 partnerships, including RK-11, with the Recorder's office for the County of Los Angeles, California. The Certificate for RK-11 identified one general partner, Cal-Am, with a $600 contribution and one limited partner, Brian J. Ginsburg, M.D., with a $3,000 contribution. An Amendment of Certificate of Limited Partnership was filed for RK-11 on January 20, 1976. The Amendment identified an additional general partner, Fisher, with no contribution, and 13 limited partners, including petitioners, with total contributions of $29,400. Another Amendment was filed in 1980 that identified Kings Point Corporation (Kings), a private corporation with which Laird was associated, as a new general partner; Fisher was reclassified as a limited partner. The Land
On November 1, 1975, BIO executed a Contract of Sale purporting to sell an *301 80-acre tract of land (the land) to RK-11 for $458,000 (approximately $5,725 per acre). The land was part of a 977-acre tract of undeveloped property held by Seniel Ostrow as trustee for a certain family trust. The purchase price of the land included a down payment of $8,000 cash and a nonnegotiable, nonrecourse promissory note for $450,000. The promissory note, dated December 31, 1975, was secured by the land. It acknowledged, without further explanation, an underlying encumbrance on the property and included the following terms of payment: (a) Loan Points of $112,500.00 (i.e., 25 points at 1%). (b) Prepaid interest for the period from November 1, 1975 to December 31, 1976 at 5.4% per annum payable on or before December 31, 1975 in the amount of $28,350.00. (c) Interest only monthly installments commencing on January 31, 1977 and continuing and including an installment on December 31, 1980. (d) Monthly installments of principal and interest in the amount of $2,605.00 commencing on February 1, 1981 and continuing approximately 30 years until the Note is paid in full. The Contract of Sale and promissory note were executed by Laird as the president of Cal-Am, which *302 was the general partner of RK-11, and by Fisher as the secretary of BIO. Neither document was recorded. On December 29, 1975, Seniel Ostrow conveyed by Individual Grant Deed the 977-acre tract of undeveloped property (the Ostrow property) to GO for $2 million (approximately $2,047 per acre) to be paid pursuant to a promissory note for $2 million. A Deed of Trust and Assignment of Rents in favor of the seller was executed by Laird and another corporate officer on behalf of GO. The Grant Deed and Deed of Trust were recorded on December 31, 1975. The promissory note required monthly payments of interest only at 7 percent per annum to commence on February 1, 1977, and to continue for 5 years. Thereafter, the note would be amortized over a period of 20 years. GO agreed to pay property taxes commencing in 1975. On December 31, 1975, GO conveyed the Ostrow property to BIO for $2 million by means of a Corporate Grant Deed executed by Laird and Fisher and recorded on the same day. In accordance therewith, BIO assumed the $2 million promissory note executed by GO in favor of Seniel Ostrow. On February 10, 1978, Laird executed a Grant Deed in lieu of foreclosure granting to Seniel *303 Ostrow the Ostrow property acquired by GO on December 29, 1975, and subsequently conveyed to BIO. The deed identified an unpaid debt of $2 million. The Condominiums
On December 22, 1975, GO entered into a Sales Contract to purchase certain Royal Kuhio condominium units from Asahi Development Hawaii Corporation (Asahi), who was then building the condominiums. Included in the purchase were 39 units on floors 26, 27, and 28 at a total cost of $2,318,400. Pursuant to the contract, GO was required to pay 25 percent of that amount by the time construction of the units was completed in the fall of 1976. The balance of the purchase price would be financed by a first mortgage from a lending institution. The Royal Kuhio condominium project was registered with the Land Court in Hawaii, and Asahi completed construction of the condominiums in August 1976. In a Contract of Sale dated November 1, 1975, GO purported to sell three Royal Kuhio condominiums to RK-11 for $210,000. The contract was executed by Laird as the president of Cal-Am, which was the general partner of RK-11, and by Fisher as the vice president and secretary of GO. The contract identified the condominiums, in typewritten *304 form, as units 1307, 1309, and 1310. This language, however, was crossed out, and handwritten notations, which were initialed by the parties, were added identifying the units as 2701, 2702, and 2703. Condominium units 1307, 1309, and 1310 were never acquired by GO or any other Cal-Am related entity. The Contract of Sale was not recorded, and no Transfer Certificate of Title between GO and RK-11 for any condominiums allegedly purchased by RK-11 was ever filed with the Land Court. The terms of purchase described in the Contract of Sale required a down payment of $12,000 and a promissory note for $198,000. The unrecorded note, which was dated December 31, 1975, and executed by the same parties who executed the Contract of Sale, was payable over a period of 35 years as follows: (a) Loan Points of $39,600 (i.e, 20 points). (b) Prepaid interest for the period from November 1, 1975 to December 31, 1976 at 7.5% per annum payable on or before December 31, 1975 in the amount of $17,325. (c) Interest only monthly installments commencing on January 31, 1977 and continuing and including an installment on December 31, 1980. (d) Monthly installments of principal and interest in the amount *305 of $1,385 commencing on February 1, 1981 and continuing approximately 30 years until the Note is paid in full. The note recognized, without further explanation, an underlying obligation on the property of approximately $170,700. As in the Contract of Sale, units 1307, 1309, and 1310 were typewritten and scratched out, and units 2701, 2702, and 2703 were handwritten and initialed by the parties. The note was nonnegotiable and nonrecourse. In August 1976, GO filed a complaint against Asahi for breach of contract of sale and sought specific performance or damages. The main issue in the litigation concerned the financing of the prospective purchases by GO. As a result of settlement negotiations, the parties filed a Stipulation for Dismissal with Prejudice on December 10, 1976. As agreed by the parties, certain units would be transferred to GO in December 1976 and January 1977. On December 13, 1976, certain condominium units were conveyed to GO, including units 2701, 2702, and 2703. The documents conveying these units were recorded with the Land Court of Hawaii on December 21, 1976. The purchase prices of units 2701, 2702, and 2703 were $67,700, $56,800, and $55,800, respectively. *306 On July 24, 1978, GO sold by Deed and Assignment units 2702 and 2703 to the Royal Hawaiian Adventure Club of Hawaii. On August 31, 1978, GO sold by Deed and Assignment unit 2701 to the same party. Both documents were recorded with the Land Court of Hawaii. Partnership Files
Cal-Am, the general partner in each of the 49 limited partnerships, maintained two sets of files for each partnership. A legal file contained certain contracts, promissory notes, leases and income tax returns. A subscription file contained completed offering questionnaires and a copy of each limited partner's contribution check. Similar documents were included in the files of every partnership. In addition to the RK-11 Certificate of Limited Partnership, the two Amendments thereto, the Private Offering Memorandum, the Contract of Sale for the land, the Contract of Sale for the condominiums, and the promissory notes executed at or about the time of those Contracts of Sale, the RK-11 legal file contained the following documents: Document
Description
Legal Retainer
Retaining legal services of Laird Inc.,
Agreement
including the preparation of documents,
(December 1, 1975)
unrecorded; signed by Laird for
both parties.
Promissory Note
RK-11 to pay Fisher Inc. $180,735;
(November 1, 1975)
unrecorded; nonrecourse; collateral: the land allegedly purchased by RK-11;
signed by Yates for RK-11.
Promissory Note
GO to pay Cal-Am $12,600; unrecorded;
(December 31, 1975)
nonrecourse; collateral: (in
handwritten form) condominium units
1201, 1202, 1203 (units 1307, 1309, 1310
were typewritten and scratched out);
signed by Laird for GO.
Promissory Note
GO to pay Cal-Am $30,000; unrecorded;
(December 31, 1975)
nonrecourse; collateral: (in
handwritten form) condominium units
1201, 1202, 1203 (units 1307, 1309, 1310
were typewritten and scratched out);
signed by Laird for GO.
Declaration of Trust
Cal-Am, trustee, to hold the $30,000 GO
(December 31, 1975)
note for the benefit of RK-11 partners;
unrecorded; signed by Laird for Cal-Am.
Post-Organization
Fisher Inc. to initiate procedure for
Management Agreement
operations of land and condominiums
(December 1, 1975)
allegedly owned by RK-11 for fee;
unrecorded; signed by Laird for RK-11
and by Fisher for Fisher Inc.
Management Agreement
Cal-Am to manage certain land and
(January 1, 1976)
condominiums allegedly owned by RK-11
for annual fee; unrecorded; signed for
both parties by Laird.
Lease
LMC to lease for 1 year with option to
(December 31, 1975)
purchase the land allegedly owned by
RK-11 (rent of $2,000 in 1976);
unrecorded; signed by Fisher for LMC and
Laird for RK-11.
Lease
Kings to lease on a year-to-year basis
(February 1, 1977)
condominium units 2701, 2702, and 2703
from RK-11 (for $500 per month per
unit); unrecorded; signed by Laird for
both parties.
Option Agreement
Granting LMC an option to purchase the
(December 31, 1975)
land (at its adjusted basis plus
150 percent of the amount of the
nonrecourse loans to RK-11 by Fisher
Inc.) and condominiums (at their
adjusted basis) from RK-11; unrecorded;
signed by Fisher for LMC and Laird for
RK-11.
Assignment of Options
To assign all of LMC's options in
(October 1, 1977)
certain partnerships to Kings;
unrecorded; signed by Laird for both
parties.
Notice of Exercise
To notify Cal-Am that Kings was
of Option
exercising its option to purchase
(December 31, 1980)
certain condominiums, including 2701,
2702, and 2703; unrecorded; signed by
Kenneth Yates for Kings and Laird for
Cal-Am.
*307 The RK-11 legal file did not contain grant deeds to or from RK-11 for either the condominium units or the land. financing
Cal-Am maintained a special account, the Cal-Am Investors Account, into which the cash investments of the limited partners such as petitioners were deposited. The limited partners' contributions to particular partnership were then made by writing one check on the Cal-Am Investors Account to the limited partnership. The limited partners were also required to make a "loan" to GO in an amount equal to their contribution to the partnership. That "loan" was also paid by one check from the Cal-Am Investors Account. All 49 limited partnerships had similar financial arrangements that were accomplished entirely through the use of checks. Mechanical instructions in the form of charts and diagrams were prepared under the direction of Laird[2] to be used by Cal-Am employees and bank employees for processing the checks. The employees of Cal-Am prepared all checks and deposit tickets for Cal-Am, LMC, GO, BIO, Fisher Inc., and Laird Inc.
*308 A bank account for RK-11 was opened with a $100 deposit by a Cal-Am check dated December 24, 1975. On December 29, 1975, the bank processed the following transactions for that account: Charges (by Check)
To the
Check
Order of
Amount
Number
Description
GO
$ 12,000
1
down payment
BIO
8,000
2
down payment
GO
39,600
3
loan points
BIO
112,500
4
loan points
GO
17,325
5
interest
BIO
28,350
6
interest
Laird Inc.
6,480
7
post-organization
legal
Fisher Inc.
6,480
8
post-organization
management
$230,735
Deposits
From
Amount
Description
Fisher Inc.
$180,735
loan
LMC
20,000
Cal-Am
600
Cal-Am Investors
29,400
L.P. Capital
Contribution
$230,735
The closing balance in the account for 1975 was $100. A summary of checks regarding RK-11 that were deposited to and drawn upon the accounts of the entities described in the paragraph above is as follows: Entity (account)
Deposited
Drawn
RK-11
$230,835
$230,735
GO
98,925
83,925
BIO
148,850
137,480
LMC
40,080
20,000
Fisher Inc.
207,805
200,735
Laird Inc.
6,480
$732,975
$672,875
All *309 of these checks, except the initial $100 deposit in RK-11, were dated December 27, 1975. The difference in the total amounts deposited and drawn is $60,100, which is composed of (1) the limited partners' contribution to RK-11 of $29,400, (2) the required "loan" by the limited partners to GO of $29,400, (3) the initial deposit in RK-11 by Cal-Am of $100, (4) the Cal-Am contribution to RK-11 of $600, and (5) the required Cal-Am loan to GO of $600. In December 1975, Laird-controlled entities conducted banking transactions with outside entities as follows: 12/17 THROUGH 12/31/75
Opening
Payments to
Balance Deposits from
Outside
Bank Account
12/17/75
Outside Source
Creditors
Cal-Am Investors
$143,408.92
$1,437,336.00
$ 6,513.15
Cal-Am
2,875.32
113.34
211,227.20
BIO
8,668.96
6,750.00
20,034.34
GO
45,524.98
58,800.00
194,529.06
LMC
1,200.00
Fisher Inc.
808.88
82,427.61
Laird Inc.
50.00
179,374.22
49 Partnerships
1,943.96
1,931.33
427.16
1,200.00
15,000.00
58,800.00
73,800.00
Total
$203,708.18
$1,652,999.34
[3] $696,036.91
Excluding the payments described above, the accounts, at the *310 close of the period described, had available funds totaling $1,856,707.52. During this period, however, the same entities, in following Laird's mechanical financial instructions, wrote 890 checks totaling more than $38 million. In December 1976, Laird-controlled entities conducted banking transactions with outside entities as follows: 12/1 THROUGH 12/31/76
Opening Balance
Deposits from
Payments to
Bank Account
12/1/76
Outside Sources
Outside Sources
Cal-Am
$ 175.91
$10,000
LMC
73.15
10,000
Fisher, Inc.
121.68
35 Partnerships
4,592.76
$4,963.50
$20,000
As a result of these transactions, the accounts, at the end of the period, had available funds totaling $24,963.50. During this period, however, the same entities wrote 207 checks totaling more than $2.5 million. The ability of the entities to write checks in 1975 and 1976 in excess of the actual or real funds present was due to the elaborate check swapping system. The following chart exemplifies the process on a smaller scale and specifically traces a swapping of checks that *311 included RK-11's "payment" of certain expenses in 1976: Date of
Date of
Amount
Check
Deposit
of Check
Maker
Depositor
Oct. 15
Dec. 10
$2,000
Cal-Am
LMC
Oct. 15
Dec. 10
2,000
LMC
RK-11
Oct. 15
Dec. 10
2,000
RK-11
Cal-Am
(for "1976 MANAGEMENT FEES")
Oct. 15
Dec. 10
18,073
Cal-Am
RK-11
Oct. 15
Dec. 10
18,073
RK-11
Fisher Inc.
(for "1976 INTEREST")
Oct. 15
Dec. 10
18,073
Fisher Inc.
Cal-Am
Each of these checks was signed jointly by Fisher and Yates. Partnership Returns
The RK-11 partnership returns for 1975 and 1976 reported gross receipts of only $2,000 rental income from LMC in 1976. They claimed deductions for interest, legal fees, and management fees of $210,735 in 1975 and $20,073 and 1976. Neither return reported any deductions for wages, property taxes, repairs, or depreciation. The 1977 partnership return reported rental income of $16,500 and deductions totaling $21,750 for interest, depreciation, and management fees. No deduction for taxes was claimed. The included balance sheet and attached copy of journal entries reported that RK-11 transferred the land (the portion of the Ostrow property *312 purportedly purchased by RK-11) to LMC for an amount equal to book value. The 1978 partnership return of RK-11 reported no gross receipts, no deductions, and the sale of the condominium units at cost. Attached to the return was a letter dated March 15, 1979, from Cal-Am to the limited partners; it was signed by Yates and included the following: Since our last report to you several important events have taken place which effect [sic] the partnership. On January 1, 1977 the partnership sold its unimproved land parcel to Legal Mortgage Corporation pursuant to the option to purchase granted to Legal Mortgage Corporation, as outlined in the Offering Prospectus. * * * This transaction did not result in a taxable event for the partnership and therefore, no items of income or loss were reportable for 1977. On January 1, 1978 the partnership also sold the three condominium units owned by the partnership. The condominium units were sold to Kings Point Corporation as the Assignee of the Option to Purchase granted to Legal Mortgage Corporation pursuant to the Offering Memorandum. * * * There is no taxable consequence in 1978 as a result of this sale; and therefore, neither items of income *313 or loss incidental to this transaction nor income and expenses from the operations of the partnership property are reportable for the tax year ending December 31, 1978. Partnership returns filed for RK-11 for 1979 through 1984 reported no gross receipts and no deductions. OPINION This case is representative of cases arising from the activities of 49 real estate limited partnerships (the Cal Am Real Estate Group). The facts in these cases are essentially identical. Certain of the remaining docketed cases have agreed to be bound by the determination reached in this case. Petitioners claim deductibility of their distributive share of RK-11's 1975 and 1976 partnership losses, which were allegedly composed of interest, management fees, and legal fees. The availability of those deductions turns on whether that partnership's transactions involving the alleged purchase, operation, and sale of certain real property were bona fide arm's-length transactions for Federal income tax purposes. Petitioners argue that the purchases were reasonable as to cost, that the points and interest charged were reasonable, and that the objective of profit by the partnership was without reference *314 to any projected tax benefits. Respondent's primary argument is that the transactions were shams, conducted solely for the purpose of generating tax deductions. Alternatively, respondent argues that the claimed interest deductions should be disallowed because the partnership never acquired title to or ownership of the property and because the nonrecourse notes greatly exceeded the fair market value of the property, the claimed deductions were never paid, and the management and legal fees were nondeductible capital expenditures. We agree with respondent's primary argument that the transactions were shams; therefore, we do not independently address respondent's alternative arguments, although we do consider some of them in our holding on the sham issue. Transactions that lack economic substance and are conducted for the sole purpose of reducing tax liability are disregarded as shams by the courts. Knetsch v. United States,364 U.S. 361 (1960); Falsetti v. Commissioner,85 T.C. 332 (1985). It is the economic substance of a transaction, not its form, that *315 controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Grodt 3 McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1226 (1981). In Frank Lyon Co. v. United States,435 U.S. 561 (1978), the Supreme Court stated: In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner of Internal Revenue v. Tower,327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S. at 255. See also Commissioner of Internal Revenue v. P.G. Lake, Inc.,356 U.S. 260, 266-267 (1958); Commissioner of Internal Revenue v. Court Holding Co.,324 U.S. 331, 334 (1945). *316 Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner of Internal Revenue v. Duberstein,363 U.S. 278, 286 (1960). [435 U.S. at 573.] In that case, the Supreme Court, in concluding that the transactions there in issue were to be recognized for tax purposes, held that where -- there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. * * * [435 U.S. at 583-584.] Based on the rationale of these cases, we recently articulated a definition of "'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic *317 significance beyond expected tax benefits." Falsetti v. Commissioner,supra at 347. [4] See Rice's Toyota World v. Commissioner,752 F.2d 89, 91-92 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983). In Falsetti, we considered the totality of the facts and circumstances and determined that the purported purchase of certain real property was a sham because of the absence of transfer of legal title or other indicia of arm's-length dealing, drastically inflated sales prices, and complete disregard of contractual terms. In this case, we have considered the entire record and conclude that the transactions in issue, i.e., the purported purchase, operation, and sale of the land and condominiums, were shams. This determination is based on many factors including lack of arm's-length dealing, circular money movements, and other questionable business practices. See Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). A close examination of the entities involved in the purported *318 transactions reveals a complete lack of arm's-length dealing. See Karme v. Commissioner,73 T.C. at 1186. As indicated throughout the record, Laird and Fisher exercised control over every entity associated with the transactions in issue. Together or individually, they represented the parties on each side of every transaction. For instance, they executed documents on behalf of the seller (BIO, GO) and the buyer (RK-11), the lender (BIO, GO, Fisher Inc.) and the borrower (RK-11), the attorney (Laird Inc.) and the client (RK-11), the optionor (RK-11) and the optionee (LMC), the lessor (RK-11) and the lessee (LMC, Kings), the assignor of the option (LMC) and the assignee of the option (Kings), the trustor (RK-11) and the trustee (Cal-Am), the promoter (Cal-Am) and the limited partnership (RK-11), and the owner (RK-11) and the manager (Cal-Am, Fisher Inc.). Accordingly, there were no negotiations among the entities. In fact, most of the transactions involving the parties described above were prearranged and laid out in detail in the offering memorandum petitioners received, and even the memorandum discussed the existence of common control among the entities. The *319 absence of arm's-length dealing is indicated by the terms of purchase in the sales contracts and promissory notes regarding the land and condominiums. In addition to interest at 5.4 percent and 7.5 percent, some of which was prepaid, these documents required 25 and 20 loan points on the amounts financed for the land and condominiums, respectively. Respondent's banking and financial expert, who was not impeached or contradicted by petitioners, testified at length regarding points. He stated that the going rate for points in 1975 and 1976 was 1 to 3 points but never more than 5 points, and that 20 or 25 points was unusual, unheard of, and would be considered a "gouge." He also stated that the loan to value ratio on the land (98 percent) was much higher than the industry norm at that time (50 to 60 percent). This testimony is credible, and we accept it. Moreover, we do not believe that independent parties would have agreed to the exorbitant terms of the transactions in issue. Payment in the form of swapping checks or other types of exchange has been disregarded by the courts. Knetsch v. United States,364 U.S. 361 (1960); *320 United States v. Clardy,612 F.2d 1139 (9th Cir. 1980). The circular transfer of money through related parties to create the illusion of payment is an indication of sham transactions. Karme v. Commissioner,73 T.C. at 1186-1187.In this case, an enormous circular money movement occurred in December of each year in issue. Detailed instructions were provided to Cal-Am employees and banking personnel for the purpose of processing the massive flow of checks during the short time periods. As set forth in the findings of fact, the exchange of checks in each year created an illusion of payment by RK-11 of certain expenses. RK-11 deposited investor contributions and large checks representing unrecorded, nonnegotiable, nonrecourse loans and simultaneously wrote checks for points, prepaid interest, and certain other fees. The checks drawn by RK-11 were far in excess of the partners' actual investment. Indeed, after the dust had settled, RK-11's bank account had the same balance as before the money movement, i.e., the debits exactly equaled the credits, and the only change of substance in the bank accounts overall was a shift of the partners' cash contributions *321 into the accounts of other Laird-controlled entities. In United States v. Clardy,supra, involving claimed payments for deductible interest, the Court of Appeals for the Ninth Circuit stated: By swapping worthless checks which nevertheless offset each other and by securing the cooperation of a friendly bank, they managed to get the checks entered as debits on the relevant bank accounts. It would be difficult, to say the least, for anyone to believe in good faith that this amounted to a payment of interest. [612 F.2d at 1152.] Likewise, we refuse to give credence to Laird's "financial fantasies." See Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). The check swapping mechanism was no more than a superficial payment structure created solely for tax benefits. See Battelstein v. Commissioner,611 F.2d 1033, 1035 (5th Cir. 1980). See also Beck v. Commissioner,74 T.C. 1534, 1562-1564 (1980), affd. 678 F.2d 818 (9th Cir. 1982), where taxpayers' partnerships were denied claimed interest deductions for alleged payments *322 pursuant to a similar Laird-designed financial scheme involving some of the same entities involved in this case. Other aspects of the partnership's alleged purchases and financing refute petitioners' characterization of the transactions. RK-11's per acre purchase price of the land was almost triple the per acre cost of the same property when it was purchased by recorded grant deed by GO, RK-11's claimed predecessor in interest, in an apparent arm's-length transaction at about the same time. Petitifoner's failure to establish that RK-11's price reflected the property's fair market value or to suggest that the acreage value was not uniform is, on these facts, "lethal" to petitioners' case. Karme v. Commissioner,73 T.C. at 1190. See Falsetti v. Commissioner,85 T.C. at 350-351. An examination of the documents in the record reveals highly questionable business practices. RK-11 allegedly purchased the land from BIO on November 1, 1975; however, BIO did not acquire the property from GO (by recorded grant deed) until December 31, 1975, and GO had not acquired the property from Seniel Ostrow (by recorded grant deed) until December 30, 1975. RK-11 *323 purported to purchase the condominiums from GO on November 1, 1975; yet the same units were not conveyed to GO (by recorded documents) until December 13, 1976. See Derr v. Commissioner,77 T.C. 708 (1981) (a partnership's purported purchase of property was held a sham transaction where the promotor, who contracted to sell the property to the partnership, had not yet acquired ownership of the property). RK-11 executed several promissory notes secured by the land or the condominiums before the respective properties were acquired. The collateral ultimately acquired, however, was inadequate. RK-11 executed two unrecorded nonrecourse notes in November and December 1975 that totaled $630,735 and that were secured by the land, which was already subject to an undescribed prior encumbrance. The total of the loans substantially exceeded RK-11's purchase price of $458,000. RK-11 also executed three unrecorded nonrecourse notes on December 31, 1975, that totaled $240,600 and were secured by the condominiums allegedly purchased. In addition to a prior encumbrance on the property of $170,700, the loans substantially exceeded RK-11's purchase price of $210,000. In view *324 of these factors, it becomes apparent that the condominiums and the land were wholly insufficient to secure the notes in full. Moreover, RK-11 did not acquire legal title to the property in issue. Hawaii State law requires that the deed or other instrument must be filed with the Land Court to effectively convey registered property. Hawaii Rev. Stat. sec. 501-101 (1976). No such document, however, was filed with respect to any condominiums allegedly purchased by RK-11 from GO. There were no grant deeds for either the condominiums or the land to or from RK-11, although they do exist (recorded) to and from BIO to GO. Other questionable business practices include (1) the handwritten alteration of the condominium unit numbers on some of the documents but not others, (2) the promise that partnership expenses would be paid out of nonrecourse loans from Fisher Inc., and (3) the absence of recordation of any of the documents in the partnership legal file. For all of the foregoing reasons, we conclude that the partnership transactions were shams, conducted for the sole purpose of generating tax deductions. Accordingly, respondent's determination disallowing petitioners' share of the *325 partnership losses is sustained. Decision will be entered for the respondent.
Footnotes
1. Although they pleaded the bar of the statute of limitations in their petition, petitioners stipulated at the time of trial that the assessment of any income tax due for the years in issue is not barred. We take judicial notice of our own records showing that petitioners' counsel routinely pleads limitations when he has no factual support for that claim. See, e.g., Chao v. Commissioner,T.C. Memo. 1985-444; Rosebrough v. Commissioner,T.C. Memo. 1985-339. Other allegations in the petition were totally unsupported by evidence, and petitioners did not testify or otherwise present any witnesses during trial. Petitioners' counsel failed to appear when this case and related cases were recalled for the submission of certain exhibits that were not attached to the stipulation filed at the time of trial. The Court, therefore, at the time of recall, suggested that the parties' briefs address the propriety of damages under sec. 6673, I.R.C. 1954, as amended. In his opening brief, respondent argued that such damages should be awarded. Petitioners failed to file a reply brief ordered by the Court, and their opening brief was totally inadequate. See Chao v. Commissioner,supra,Lui v. Commissioner,T.C. Memo. 1985-374, and cases cited therein, wherein petitioners' counsel, representing taxpayers in other tax shelter arrangements promoted by Joseph Laird, experienced the actual imposition and warning of the imposition of damages where he persisted in presenting legally stale and factually groundless claims. Because the exact factual situation existing in this case has not previously been ruled on, we resist the strong impulse to award damages. See Brown v. Commissioner,85 T.C. 968, 1001-1004 (1985). We note, however, that under our new Rule 33(b), Tax Court Rules of Practice and Procedure↩, effective July 1, 1986, we have available in the future additional sanctions against counsel who signs a pleading that he knows is not well founded in fact and warranted in law and/or that is interposed to cause delay.
2. The parties stipulated that this method of financing was similar to that used by Laird and Cal-Am in 1974 real estate tax shelters and 1976 coal tax shelters. See Beck v. Commissioner,74 T.C. 1534, 1544-1547 (1980), affd. 678 F.2d 818 (9th Cir. 1982), and Hawley v. Commissioner,↩ docket No. 12316-83, and related cases tried and submitted to the Court.
3. Respondent computed this total as $695,963.91. The error in addition has been corrected.↩
4. See also Steinert v. Commissioner,T.C. Memo. 1985-581↩.