## JAMES HELBA, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8218-83, 21648-84.     Filed October 30, 1986.

*Kenneth M. Barish, Henry W. Walther,* and *John D. Humbert* for the petitioner.

*Marshall W. Taylor* and *Phoebe L. Tang,* for the respondent.

NIMS, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1979 | $40,701.00 |
| 1980 | 54,942.12 |
| 1981 | 35,482.90 |

The issues for decision are:

(1) Whether the transactions between the partnerships, executive producers, and producers were tax shams lacking economic substance;

(2) Whether the activities of the partnerships with respect to the purchase and distribution of the videotapes consti-

tute activities engaged in for profit within the meaning of section 183;[1]

(3) Whether the partnerships may include in their basis in the videotapes the amounts represented by convertible notes;

(4) Whether petitioner's basis in his partnership interests includes amounts attributable to services rendered or amounts paid with a promissory note;

(5) Whether petitioner's amount at risk includes his pro rata portion of the partnerships' liabilities represented by the convertible notes;

(6) Whether the partnerships used a proper method of depreciation for the videotapes;

(7) Whether the partnerships are entitled to deduct organizational costs, management fees, legal fees, commissions, and interest in the years in which they were incurred or paid;

(8) Whether petitioner is entitled to claim investment tax credits with respect to the videotapes; and

(9) Whether petitioner substantially underpaid tax in the years in issue as a result of a tax-motivated transaction within the meaning of section 6621(d).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

### Background

Petitioner resided in Pittsburgh, Pennsylvania, at the time the petitions were filed in this case.

Petitioner is a certified financial planner and was a general partner in each of the four limited partnerships which are the subject matter of this case. The four partnerships are Children's Fantasy, Ltd. (CFL), Geppetto's Music Shop (GMS), Merry Wives, Ltd. (MWL), and Macbeth, Ltd. (MBL) (collectively referred to as the partnerships).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner also held an interest as a limited partner in MWL. Each of the partnerships elected to use the accrual method of accounting.

As a certified financial planner, petitioner evaluated investment alternatives and advised clients on choosing investments. In the fall of 1978, petitioner attended a 4-day convention of the International Association of Financial Planners where, among other investment opportunities, firms were marketing videotape programs. Prior to this, petitioner had no knowledge or background in videotapes, movies, films, the home entertainment industry, or product distribution, other than being involved with the distribution of one film in 1976. Petitioner contacted only a few sellers of videotape investments, but he did receive a great deal of literature on such investments.

Knowing of petitioner's interest in videotape products, a colleague of petitioner's suggested that he contact Century Video Corp. (Century). Petitioner contacted Lawrence Scheer at Century in November 1978. Scheer had formed Century in 1977, to act as an executive producer of television products. Scheer had first begun researching television production and the home video market in 1976. Prior to this, he had a 25-year career in the life insurance business. Leonard Francouer was the president and a director of Century.

Between 1977 and 1980, Century marketed single shows to individuals by use of an investment vehicle referred to as "one-on-ones." Century contracted with Solaris International Pictures, Inc. (Solaris), to produce these shows. Century generally sold the one-on-ones to individual investors for a fixed price of $100,000, usually consisting of $10,000 cash and a promissory note in the amount of $90,000. Century would pay Solaris $6,000 to $7,000 in cash and execute a promissory note for $60,000 to $65,000 for the production. The notes executed by the investors were initially fully recourse with respect to the investors, but upon the occurrence of certain contingencies could convert to nonrecourse.

Solaris was a company through which Glenn Taylor produced television programs.[2] Through at least 1979, Glenn Taylor did not own any of Solaris' stock, but at some undetermined date he acquired an option on Solaris' stock by guaranteeing approximately $1 million of the company's debt. He later gained control of Solaris by exercising this option. Glenn Taylor had previously produced television programs through a wholly owned company, Syntar Productions (Syntar), but when Solaris was formed it took over the use of Syntar's production facilities. From 1975 to 1977, Syntar's productions were predominantly one-half hour shows which were financed by use of one-on-one investments. During 1976 and 1977, approximately 100 to 110 individuals purchased videotape productions from Syntar.

Prior to 1979, Century sold approximately 120 Solaris one-on-ones to 80 individuals. Starting in early 1979, petitioner recommended the purchase of videotapes marketed by Century to his financial planning clients. Approximately 20 of petitioner's clients invested in the one-on-ones, for which petitioner received client fees and sales commissions. None of these one-on-ones have returned any income to their individual investors.

### Production and Financing Structure

In 1977, Scheer met with Jacob Brandzel, a tax partner in the accounting firm of Laventhol & Horwath, and Shelley Banoff, a tax attorney in the Chicago law firm of Katten, Muchin, Gitles, Zavis, Pearl & Galler, to discuss changes in the tax laws and development of a financing structure for producing videotapes based on a partnership format. The financing structure developed by Scheer, Brandzel, and Banoff was used as the basis for the partnerships in this case. The plan required the partnerships to enter into a contract to purchase a videotaped production from an executive producer in exchange for cash and a note. Investor/limited partners contributed cash to the partnership and executed assumption agreements which made them personally liable for a pro rata portion of the note executed by the partnership. The liability of the limited partners

---

[2]The role of a production company such as Solaris or Syntar is to create the production. This includes writing the production and providing a producer, creative staff, and talent.

pursuant to the assumption agreements, however, could terminate upon the occurrence of certain contingencies.

The executive producer was to acquire the videotaped production by entering into a production order subcontract with a producer. This contract would allow the executive producer to pay for the production by use of cash and deferred obligations. The producer, in turn, would hire talent to work on the production by paying them minimum cash payments and deferred obligations.

## Debt Structure

Banoff and Brandzel also developed the form of the notes executed by the partnerships and the assumption agreements executed by the investor/limited partners. The outstanding principal on each note, along with any accrued but unpaid interest, was due on February 1 of the eighth year following the year in which they were executed. The notes bore interest at an annual rate of 9 percent, but interest in excess of $52,000 per year could be accrued and added to principal. The partnerships were required to use 80 percent of the gross receipts from distribution to pay principal and interest on the notes in each year.

The liability of the investor/limited partners under the assumption agreements could terminate, and the notes become nonrecourse, upon the occurrence of either of two contingencies. Their liability terminated if, at anytime during the term of the note, the partnership made payments on the note (interest and/or principal) totaling at least one-half of the principal amount of the note. If such payments were not made within 4 years following the execution of the note, however, the seller acquired exclusive rights to distribute video cassettes and video discs of the production. Thereafter, the liability of the limited partners would terminate if 4 million (5 million in the case of MBL) video disc and video cassette players had been sold in the United States, and $100,000 of gross distribution revenues were received after the end of the fourth year but before the maturity date of the note.

The principal amount of the note was determined by using the following method: (1) The approximate cash cost of the production was determined; (2) the amount to be

deferred was calculated by subtracting the amount of the cash down payment from the estimated cash cost of the production; (3) the amount to be deferred was "capitalized" at an annual interest rate of 20 percent over the term of the note;[3] and (4) this "capitalized" amount was increased by approximately 25 percent, so as to provide the seller with a profit. The note's 9-percent stated interest accrued on the principal amount of the note calculated by this method. For each of the productions here under consideration, petitioner believed that the cash cost of production would be approximately $725,000.

## Offering Memoranda

The offering memorandum for each of the partnerships contained a section entitled "Suitability Standards for Investors," which required a potential investor to represent that he had a net worth of at least $150,000 (excluding home, home furnishings, and automobiles) or that he expected to have income during the year of investment and the succeeding year, which is taxable in a Federal tax bracket in excess of 50 percent, or if a corporate investor, taxable at the maximum regular corporate rate. The reasons given for this requirement were that the partnership interests were relatively illiquid and "that the relative financial benefit of an investment in the Partnership will generally depend substantially on the tax bracket of the investor."

The cost of a limited partnership unit, the number of units offered, the minimum number of units which could be purchased, and the total anticipated capitalization for each of the partnerships, as set out in the offering memoranda, were as follows:

|  | CFL | GMS | MWL | MBL |
|---|---|---|---|---|
| Cost of one unit | $1,000 | $1,600 | $1,150 | $1,200 |
| Total number of units offered | 350 | 250 | 350 | 350 |
| Minimum units per investor | 10 | 10 | 10 | 10 |
| Total anticipated capitalization | 350,000 | 400,000 | 402,500 | 420,000 |

The estimated use of these proceeds was shown to be as follows:

---

[3]Under the plan used by petitioner, this "capitalization" was done by determining the future value in 7 years of the amount to be deferred using a 20-percent annually compounded interest rate. This is done by multiplying the deferred amount by 1.20 or approximately 3.58. See Compound Interest and Annuity Tables, p. 1840 (C. Gushee 6th ed. 1980).

| | CFL | GMS | MWL | MBL |
|---|---|---|---|---|
| Cash downpayment for production | $230,000 | $230,000 | $250,000 | $270,000 |
| First year interest payment[1] | 30,000 | 30,000 | 30,000 | 40,000 |
| General partner's fee[2] | 32,000 | 30,000 | 26,275 | 40,000 |
| Legal and accounting costs[3] | 21,000 | 25,000 | 35,000 | 30,000 |
| Partnership working capital | - - - | - - - | - - - | 15,000 |
| Reserve[4] | 37,000 | 25,000 | 25,000 | 25,000 |
| Sales commissions | - - - | 30,000 | 36,225 | - - - |
| Total | 350,000 | 370,000 | 402,500 | 420,000 |
| Proceeds unaccounted for | - - - | 30,000 | - - - | - - - |

[1]This was variously designated as "interest prepayment," "interest prepayment and reduction of principal" or "interest payment on the purchase price note."

[2]This was designated as either "general partner's initial management fee" or "general partner's fee for services in organizing the partnership."

[3]The MWL offering memorandum listed this as "legal and accounting costs incurred in connection with the offering and organization of the partnership."

[4]The reserve was designated as either "reserve for operations, extraordinary expenses and annual interest requirement," "reserve for accounting and legal fees in the event of an audit by the Internal Revenue Service," "reserve for operations, extraordinary expenses, annual interest requirement, working capital and other liabilities of the partnership" or "Internal Revenue Service reserve."

The memoranda also informed the potential investor that a limited partner could be subject to an annual assessment if necessary to allow the partnership to meet its annual minimum interest payments.

The per-unit cost of a partnership interest was not identified as including any portion of the liabilities to be assumed by the limited partners. The requirement that the limited partners execute the assumption agreements was explained in a section of the offering memoranda entitled " 'At Risk' Provisions." This section explained that, due to the Tax Reform Act of 1976 and the Revenue Act of 1978, the investors would be limited in recognizing losses from the partnership to the extent their investment was "at risk." A partner's amount "at risk" was defined as "the amount of his actual net cash investment in the Partnership, plus the portion of any Partnership liabilities for which such limited partner is personally liable." Immediately following this explanation, it was stated that each investor would be required to accept personal liability for a pro rata portion of the principal amount of the purchase

price note. This section also explained that the requirement of personal liability materially increased the risks to investors and that no party involved with the investment or production guaranteed that sufficient revenues would be generated to cause the purchase price note to become nonrecourse.

The offering memoranda stated the purchase price which would be paid by each of the partnerships and that each of these purchase prices was based on "a represented projected production cost."[4] The purchase prices and the represented projected production costs for each of the productions to be acquired were shown to be as follows:

| Partnership | Purchase price | Production cost |
|---|---|---|
| CFL | $2,300,000 | $1,650,000 |
| GMS | 2,300,000 | 1,800,000 |
| MWL | 2,320,000 | 1,624,000 |
| MBL | 2,300,000 | 1,700,000 |

In none of the memoranda was it represented that the purchase price was the fair market value of the production or that the represented projected production cost was a reasonable production cost.

The section of the operating memoranda entitled "Anticipated Results of Operations," stated that while the ultimate goal of the partnership was to profit from the exploitation of the production, it was anticipated that during at least the first 2 years of operation, losses would be incurred by the partnership. Schedules contained in the CFL and GMS offering memoranda showed anticipated expenses for the two partnerships during the years in issue, their first 3 years of operation, to be as follows: [5]

| | CFL | | | GMS | | |
|---|---|---|---|---|---|---|
| | 1979 | 1980 | 1981 | 1979 | 1980 | 1981 |
| Depreciation | $214,285 | $582,994 | $420,506 | $80,357 | $620,409 | $447,231 |
| Legal and accounting | 10,000 | 1,500 | 1,500 | 15,000 | 1,500 | 1,500 |
| Organizational fees | 1,300 | 2,600 | 2,600 | 1,000 | 8,000 | 8,000 |
| G/P management fee | 32,000 | 1,200 | 1,200 | - - - | 3,000 | 3,000 |

---

[4]From the context in which it is used, this appears to mean represented by either the executive producer or producer.

[5]These schedules also showed anticipated investment tax credits of $153,000 in 1979 for each of the partnerships.

| | CFL | | | GMS | | |
|---|---|---|---|---|---|---|
| | 1979 | 1980 | 1981 | 1979 | 1980 | 1981 |
| Interest expense[1] | $62,100 | $174,842/ 186,300 | $129,546/ 186,300 | $29,510 | $208,102/ 211,243 | $164,907/ 187,294 |
| Total expenses | 319,685 | 763,136/ 644,594 | 555,352/ 612,106 | 125,867 | 841,011/ 844,152 | 624,638 647,025 |

[1]The variation in interest expenses for the years 1980 and 1981 is a product of hypothetical assumptions about the amount of principal paid down in those years. The offering memoranda did not give these figures as projections of the amounts of principal which would be paid down in the years in issue.

No such breakdown of anticipated expenses was given in the MWL or MBL offering memorandum. None of the memoranda made projections of, or representations concerning, the income stream that could be expected from the exploitation of the productions.

Petitioner was the sole general partner of CFL and MBL, but was a co-general partner with Henry L. Chiesa in GMS and MWL. The offering memoranda identified petitioner as a certified financial planner, who acts as an insurance broker and general agent. Chiesa was identified as the president, chief executive officer, and principal stockholder of Managed Investments, Inc., a broker/dealer.

The risk factors listed in the memoranda included the lack of experience of the general partner(s) in acting as a general partner of a limited partnership and lack of experience in the production, distribution, and exploitation of the type of productions involved. The memoranda also stated that the general partner(s) would rely substantially on the efforts of the sellers, executive producers, producers, and distributors, and that while the general partner(s) would have sole control of the management of the partnership, he (they) would not be required to devote full-time efforts to the affairs of the partnership. The CFL and GMS memoranda also noted that the producer of the series had been in business for only a short time (1½ to 2 years), that the distributor was a newly formed subsidiary of the producer, and that neither the producer nor the distributor had previous experience distributing television series. The MBL and MWL memoranda stated that the producer had no other experience in producing videotapes of Shakespeare's plays and that there was insufficient prior experience

concerning the distribution of theatrical videotapes for reliable estimates to be made of likely distribution revenues.

The general partner(s) received a 1-percent share of the profits, losses, and distributable cash-flow of the partnership in exchange for a cash investment of $1,000. As compensation for acting as general partner(s), the offering memoranda stated that petitioner (and Chiesa in GMS and MWL[6]) would receive: (1) An initial fee, from the proceeds of the offering, for services rendered in organizing and managing the partnership; (2) an annual management fee commencing in the second year of partnership operations, which would be paid from net cash-flow of the partnership after the minimum interest payments had been made in each year; and, (3) if the limited partners received cash distributions equal to 125 percent (100 percent in the case of CFL) of their cash investment and were no longer personally liable on the purchase price note, an increased percentage of distributable cash-flow. The amounts of the initial fees, annual fees, and increased percentage of distributable cash flow were as follows:

|  | CFL | GMS | MWL | MBL |
|---|---|---|---|---|
| Initial fee | $32,000 | $30,000 | $26,275 | $40,000 |
| Annual fee | 1,200 | 3,000 | 3,000 | 3,000 |
| Increased percentage | 11% | 34% | 34% | 34% |

The CFL and GMS offering memoranda stated that of the amounts paid to the seller of the production to reduce the purchase price note, 20 percent would be paid to Century as compensation for its services as executive producer, 75 percent would be paid to Solaris, and 5 percent would be retained by the seller. The MWL memorandum stated that of the amounts paid to the seller, 70 percent would be paid to the producer. The executive producer was to receive no compensation for acting as executive producer of Merry Wives, other than the indirect benefit of the amounts retained by the seller, its wholly owned subsidiary. The MBL offering memorandum did not designate the portions of the amounts paid to the seller which were to be passed on to the producer and executive producer.

---

[6]The offering memoranda for GMS and MWL did not state the amounts of fees due the general partners separately, but only gave aggregate amounts.

## Productions

In 1979, CFL and GMS financed the production of two 13-episode children's series entitled "Memoirs of a Fairy Godmother" (Memoirs) and "Geppetto's Music Shop" (Geppetto's), respectively. CFL acquired all rights to Memoirs from Justin-Pacific Corp. V (JPV), a wholly owned subsidiary of Century. GMS acquired all rights to Geppetto's from Justin-Pacific Corp. II (JPII), another wholly owned subsidiary of Century. Century was the executive producer for each of these productions and created the Justin-Pacific subsidiaries for the sole purpose of financing their respective productions. Both Memoirs and Geppetto's were produced by Solaris.

In 1980, MWL purchased all rights to a master videotape of Shakespeare's play "The Merry Wives of Windsor" (Merry Wives) from Bard I, Inc. (Bard I), a wholly owned subsidiary of Bard Productions, Ltd. (Bard). Bard was the executive producer of Merry Wives and was formed by Scheer and Francoeur to produce Shakespeare's canon of plays on videotape. Merry Wives was produced by and taped at the facilities of the Shakespeare Society of America (SSA). SSA was a nonprofit corporation which produced live Shakespearean plays, but which had no prior experience in the production of videotaped plays.

Merry Wives was originally planned for production in 1979, with funding to come from Windsor Partners, a partnership in which petitioner would have again been the general partner. The videotaping of Merry Wives was completed in 1979, but the partnership was not fully subscribed by the end of that year. As a result, Windsor Partners was abandoned in December 1979, and the investors who had subscribed to interests in Windsor Partners had their contributions transferred to, and became limited partners in, GMS. MWL was then formed in 1980 to acquire Merry Wives from Bard I.

In 1981, MBL financed the production of a videotaped version of Shakespeare's play "Macbeth." MBL acquired all rights to the production from Bard II, Inc. (Bard II),[7] a wholly owned subsidiary of Bard. Bard was the executive

---

[7] JPII, JPV, Bard I, and Bard II each had an initial capitalization of $1,000 and no additional capital was ever added.

producer of Macbeth and the Shakespeare Video Society (SVS), a nonprofit corporation, was the producer.[8] SVS was formed to produce Shakespearean plays for Bard because of severe production problems encountered in SSA's production of Merry Wives.[9] The principals of SVS, however, were independent of Bard.

The parties involved with the productions, the amounts paid by the partnerships to purchase their respective productions, and the terms of the notes executed by the partnerships were as follows:

|  | CFL | GMS | MWL | MBL |
|---|---|---|---|---|
| Seller | JPV | JPII | Bard I | Bard II |
| Executive producer | Century | Century | Bard | Bard |
| Producer | Solaris | Solaris | SSA | SVS |
| Execution date of acquisition agreement | 10/4/79 | 10/4/79 | 12/31/80 | 10/21/81 |
| Total purchase price | $2,300,000 | $2,300,000 | $2,320,000 | $2,300,000 |
| Cash down | $230,000 | $230,000 | $250,000 | $270,000 |
| Principal amount of note | $2,070,000 | $2,070,000 | $2,070,000 | $2,030,000 |
| Execution date of note | 10/4/79 | 11/18/79 | 12/31/80 | 10/21/81 |
| Maturity date of note | 2/01/87 | 2/01/87 | 2/01/88 | 2/01/89 |
| Payments required to trigger conversion in first 4 years | $1,035,000 | $1,035,000 | $1,035,000 | $1,015,000 |

By 1978, Glenn Taylor had established an ongoing business relationship with Scheer and Century. In 1979, Solaris was Century's only producer, and Scheer neither negotiated with other producers nor cost-shopped with respect to the productions. At the time discussions began between Scheer and Solaris with respect to the production of Memoirs and Geppetto's, Solaris had produced more than 100 children's shows for Century.

At the time petitioner became a general partner in each of the four partnerships, Scheer had already set the terms upon which the videotapes would be produced. As a result, there were no negotiations between petitioner and Scheer with respect to the prices to be paid by the partnerships for the videotapes. Petitioner did not request that Scheer obtain other bids for the production of Memoirs or Geppet-

---

[8]The MBL offering memorandum states that SSA was to be the producer of Macbeth, but SVS was substituted for SSA.

[9]The production problems encountered with Merry Wives appear to have resulted from the fact that SSA's theater was not adequately designed for the videotaping of a play.

to's. Nor did petitioner inquire into the actual costs of Solaris in producing Memoirs and Geppetto's.

In 1979, both Century and Solaris made estimates of the production costs of Memoirs and Geppetto's. These estimates were based on the concept of executing notes with principal amounts in excess of the cash costs for certain of the expenses. John Filatreau, Solaris' accountant, developed the Solaris estimates by taking the production order subcontract price and backing out allocations by use of "accountant's license." No amount was allocated to Solaris' profit margin. Following the production of Memoirs and Geppetto's, Filatreau prepared a schedule of Solaris' production costs and profit markup by allocating expenses from the company financial records. The partnership returns for CFL and GMS also list costs for the productions, but the costs are not broken down and they include Century's profit margins (which were not included in any of the other cost statements). These cost statements are summarized as follows:

For Memoirs—

| | Solaris estimate | Century estimate[1] | Solaris cost schedule | Partnership return |
|---|---|---|---|---|
| Story | $263,300 | $232,700 | $403,750 | - - - |
| Supervisors | 277,700 | 101,400 | 170,000 | - - - |
| Cast | 200,000 | 131,300 | 77,625 | - - - |
| Direction | 100,000 | 104,000 | 170,000 | - - - |
| Total above-the-line cost | 841,000 | 569,400 | [2]821,375 | - - - |
| Total below-the-line cost | 861,500 | 730,600 | 289,685 | - - - |
| Total cost of shows | 1,702,500 | 1,300,000 | 1,111,060 | 2,050,000 |
| Record albums, cassettes, and storybooks | - - - | 650,000 | - - - | 150,000 |
| Ancillary rights | - - - | - - - | - - - | 100,000 |
| Markup | - - - | - - - | 591,440 | - - - |
| Dated | 10/30/79 | 1/07/79 | - - - | 3/18/81 |

[1]The Century estimates were actually prepared on a per-episode basis. Scheer testified that the proper estimates for the cost of each series could be obtained by multiplying the figures by 13, the number of episodes in each series. For comparison purposes, we have done so.

[2]For both Memoirs and Geppetto's, Solaris' post-production cost schedules designate the above the line costs as deferred costs.

For Geppetto's—

| | Solaris estimate | Century estimate | Solaris cost schedule | Partnership return |
|---|---|---|---|---|
| Story | $263,300 | $299,000 | $403,750 | - - - |
| Supervisors | 277,700 | 104,000 | 170,000 | - - - |
| Cast | 200,000 | 187,200 | 77,625 | - - - |
| Direction | 100,000 | 104,000 | 170,000 | - - - |
| Total above-the-line cost | 841,000 | 694,200 | 821,375 | - - - |
| Total below-the-line cost | 861,500 | 930,800 | 289,685 | - - - |
| Total cost of shows | 1,702,500 | 1,625,000 | 1,111,060 | $2,300,000 |
| Record albums and cassettes | - - - | 260,000 | - - - | - - - |
| Storybooks | - - - | 65,000 | - - - | - - - |
| Markup | - - - | - - - | 591,440 | - - - |
| Dated | 12/21/79 | 11/01/79 | - - - | 3/13/80 |

The Century cost estimates were purportedly provided to petitioner prior to his entering into the acquisition agreements. As to Geppetto's, however, the acquisition agreement was executed prior to the date shown on the Century cost estimate. The dates shown on the Century cost estimates for each of the productions and the execution dates for each of the acquisition agreements also precede the dates shown on the Solaris cost estimates.

The amounts designated as the costs of the "story" in each of the cost breakdowns were amounts to be paid by Solaris to Syntar, Glenn Taylor's wholly owned company, pursuant to licensing agreements. These agreements gave Solaris the right to use the story lines as developed by Syntar in exchange for $425,000 per production. For each of the productions, $21,250 was to be paid upon execution of the contract, and the balance of $403,750 was to be paid out of 30 percent of all moneys received by Solaris after Solaris had received $300,000. As to both productions, the licensing agreements were dated earlier than the Solaris cost estimates, but the Solaris cost estimates do not accurately reflect the agreed costs of the story lines. The amounts reflected on the Solaris cost schedules reflect the deferred portions of the agreed costs.

Solaris also executed administrative consulting contracts with Syntar for Memoirs and Geppetto's. Each of the contracts required Solaris to pay to Syntar, in exchange for

Syntar's consulting services, 14 percent of all moneys received by Solaris from the production after Solaris had received $486,500. It is unclear whether any of the cost estimates for Memoirs or Geppetto's reflect amounts to be paid by Solaris pursuant to these contracts, but if Solaris were paid the full $1,702,500 due it, the payments required to be made to Syntar pursuant to the consulting contracts would be approximately $170,000, the amount shown in the Solaris cost schedule for "Supervisors."[10]

While the Century cost estimate for Memoirs shows a total estimated cost for record albums, cassettes, and storybooks of $650,000, the CFL partnership return shows a cost basis in those items totalling only $150,000. The Century cost estimate for Geppetto's shows a total estimated cost for these items of $325,000, but the GMS partnership return does not claim any cost basis in such items.

Century also made estimates of the production costs of Merry Wives and Macbeth based on the concept of executing notes with principal amounts in excess of the cash costs for certain of the expenses. These cost estimates are summarized as follows:

|  | Merry Wives | Macbeth[1] |
|---|---|---|
| Story | $500 | $500 |
| Supervisors | 406,350 | 436,350 |
| Cast | 420,350 | 420,350 |
| Direction | 130,900 | 150,900 |
| Total above-the-line cost | 958,100 | 1,008,100 |
| Total below-the-line cost | 482,850 | 522,850 |
| Total direct cost | 1,440,950 | 1,530,950 |
| Contingency | 57,750 | 57,750 |
| General studio overhead | 111,300 | 111,300 |
| Total cost | 1,610,000 | 1,700,000 |

[1]The cost estimate for Macbeth is dated July 1980. This is prior to the formation of SVS, the producer of Macbeth.

The production order subcontract executed between Bard I and SSA obligated Bard I to pay $1,624,000 to SSA in consideration for the production. Of this amount, $175,000 was to be paid upon execution of the contract, and the balance, together with interest at the rate of 9 percent per annum, was due on or before February 1, 1988. The

[10]This is calculated as follows: ($1,702,500 − $486,500) × $0.14 = $170,240

contract also required Bard I to make interest and principal payments from 70 percent of any payments received from MWL.

While a production order subcontract was the focus of negotiations between Bard II and SVS, such a contract was not, in fact, ever executed. The understanding developed between Bard II and SVS was that Bard II would provide a certain amount of cash for the production of the play and that 70 percent of the amount received by Bard II from MBL would be paid to SVS. SVS was not involved in setting the $2.3 million price which was to be paid by MBL, nor did SVS attempt to bargain for an interest in MBL's note in excess of the 70 percent it was offered by Bard II. The original cash budget agreed to was $225,000, but this was later increased to $245,000.

The 70-percent interest of SVS in MBL's obligation to Bard II was actually obligated to members of the production staff, cast, and crew of Macbeth as compensation for their services. This was done by the manager of SVS, Susan Marrone, negotiating percentage interests with these individuals, and Bard II (not SVS) executing 7-year notes for the negotiated percentages. These notes bore interest at 9 percent and were to be paid out of their stated percentages of amounts received by Bard II from SVS.[11] Two sets of notes, however, were actually executed by Bard II for this purpose. The original set of notes provided that if the principal had not been paid in full as of the maturity date, no further payments of principal or interest were to be made unless Bard II regained possession of the videotape and thereafter commercially exploited the videotape. The second set of notes, which replaced the original set, provided that if the principal and interest had not been paid in full as of the maturity date, all such amounts were then payable in full from Bard II.

Independent of the production order subcontract which had been executed by Bard II and SSA, the actual production arrangements for Merry Wives were similar to those for Macbeth. Bard I executed notes in favor of members of the production staff, cast, and crew representing 70 percent

---

[11]This scheme guaranteed that those holding the notes would at least receive a percentage of the minimum interest paid by the partnership.

of MWL's obligation to Bard I. This left Bard I obligated to SSA for only the cash amount agreed to in the production order subcontract. The notes executed by Bard I were similar to the second set of notes executed by Bard II for Macbeth and were not executed until early 1982. This was after the second set of notes was executed by Bard II and more than 2 years after the videotaping of Merry Wives.

Both SSA and SVS were required to enter into agreements with the American Federation of Television and Radio Artists (AFTRA) prior to the production of Merry Wives and Macbeth. Both of these agreements were nonbroadcast production agreements. The agreement entered into by SSA allowed for broadcast uses of the production (i.e., use by network television, syndicated television, public television, and pay television) only if SSA paid to the AFTRA members additional compensation as set forth in the AFTRA code. The agreement entered into by SVS, however, provided that SVS was required to notify AFTRA at least 60 days prior to the date of any broadcast use of the production and that SVS would then be required to bargain with AFTRA for the amount and terms of additional compensation to be paid the AFTRA members. The agreement also provided that the production was not to be released for broadcast use pending an agreement between SVS and AFTRA as to such additional compensation.

In 1980, CFL made loans to Century in at least the amount of $28,400. The loans were payable on demand and earned interest "at the prevailing rate of 'Fidelity cash reserve money market fund.'" By the beginning of 1983, the total loan balance owed CFL by Century was $40,588.32. This amount was used as an offset in 1983 to unpaid 1982 minimum interest and 1983 minimum interest owed JPV by CFL.

In 1981, a receivable was created in favor of GMS in the amount of $24,912 with the same interest provisions as those applying to the loans from CFL to Century. This receivable resulted from overpayments to JPII and Century by GMS and Windsor Partners. As of the end of 1982, the balance owing on the receivable was $32,634.58. This amount was then used as an offset to the 1982 minimum interest owed JPII by GMS.

In 1981, a receivable was created in favor of MWL by Bard I in the amount of $12,000 with the same interest provisions as above. This receivable resulted from overpayments by MWL to Bard I. At the end of 1983, the balance owing on the receivable was $17,048.26. This amount was then used as an offset to the 1983 minimum interest owed Bard I by MWL.

In 1981, MBL loaned Century $25,000 for which Francoeur, as president of Century, executed a demand note in favor of Managed Investments, Inc., Chiesa's company. The note provided that in the event that the balance due was not paid on demand, interest would be added at a rate of 15 percent per annum. The note did not provide for the payment of any other amounts as interest.

*Distribution Efforts*

Because of his lack of experience in the area, petitioner relied on the advice of others, primarily Scheer, with respect to distribution strategy and the choice of distributors. Petitioner had a clear understanding prior to the startup of the partnerships that Scheer and Century would take the responsibility for placing the shows in distribution. In fact, each of the distribution contracts executed by the partnerships was negotiated by Scheer or another agent of Century.

Initially, the distribution contracts entered into by the partnerships were nonexclusive arrangements. Scheer negotiated nonexclusive contracts for two reasons: (1) He had been advised that if an exclusive distribution contract were executed and the distributor failed to make money, the partnership involved could lose its investment tax credit; and (2) Scheer considered himself to be an amateur in the distribution business and therefore wished to have flexibility with respect to the distribution contracts he negotiated for the partnerships.

Memoirs and Geppetto's were initially to be distributed by Solaris International Distributors, Inc. (SID), a wholly owned subsidiary of Solaris, pursuant to a nonexclusive distribution contract. Neither SID nor Solaris, however, had any previous experience distributing television series. SID attempted to find responsible syndicators to aid it in

distributing the series, but the decision was eventually made by Solaris personnel that SID was not reasonably equipped to accomplish television distribution. No actual marketing of Memoirs or Geppetto's was ever accomplished by SID.

Prior to 1982, the partnerships entered into distribution contracts with the following distributors:

| Date | Partnership | Distributor |
|------|-------------|-------------|
| 2/19/80 | CFL | Videotheque Entertainment Corp. |
| 11/01/80 | CFL | Joseph Green Pictures |
| 4/81 | CFL | Telepictures Corp. |
| 11/02/81 | CFL | Cinaco Television Co. |
| 2/19/80 | GMS | Videotheque Entertainment Corp. |
| 11/01/80 | GMS | Joseph Green Pictures |
| 4/81 | GMS | Telepictures Corp. |
| 11/02/81 | GMS | Cinaco Television Co. |
| 3/09/81 | MWL | Videotheque Entertainment Corp. |
| 10/21/81 | MBL | Videotheque Entertainment Corp. |

Each of the above contracts granted certain distribution rights to the distributor in exchange for the distributor's agreement to pay over to the partnership a specified percent of the distributor's gross receipts or gross income from distribution of the production.[12] The contracts required nothing more of the distributors than that they act in good faith or with best efforts in pursuing the distribution of the products.

In 1982, distribution contracts were entered between CFL and Century Home Video (CHV) and between GMS and CHV with respect to the distribution of Memoirs and Geppetto's in the home video market. CHV was a new distribution company incorporated by the principals of Century and 50 percent owned by Scheer. These contracts gave CHV exclusive worldwide rights to the distribution of Memoirs and Geppetto's in the home video market for a period of 20 years. As executed by petitioner, however, these contracts purported to forbid CFL or GMS from bringing any action or proceeding against CHV based on a claim that CHV had not properly distributed the productions. The contracts also gave CHV the right to execute further distribution contracts without the approval of petitioner.

---

[12]This scheme guaranteed that those holding the notes would at least receive a percentage of the minimum interest paid by the partnership.

Contracts identical to the CHV contracts were also executed in 1982, between MWL and Bard Home Video (BHV) and between MBL and BHV. BHV was another distribution company incorporated by the principals of Century.

### Income Projections

Merry Wives was the only production which petitioner had reviewed by an appraiser prior to entering into the acquisition agreement for the production. Merry Wives was also the only production which was in its finished form and which petitioner viewed prior to its acquisition. The appraisal report was done by Toluca Productions and signed by Bill Eliscu. It was dated May 30, 1980. The report predicted that in the following 5-year period, Merry Wives would generate $5.1 million in gross receipts, broken down as follows:

```
Commercial U.S. Television
     First runs.....................................  $600,000
     Reruns........................................   700,000
Foreign television ...............................   650,000
Cable television .................................  1,000,000
Closed circuit television..........................   250,000
Educational market ..............................   400,000
Prerecorded videotapes and discs..................  1,700,000
Total ..........................................  ¹5,100,000
```

[1]The report showed the sum of these numbers to be $5.1 million, while the actual sum is $5,300,000.

Eliscu based his estimate of U.S. commercial television receipts on an assumption that 6 percent of the U.S. commercial television stations would air the play, paying an average of $10,000 for a first run and airing it again once every 2 years at a lesser rental. The basis for assuming a 6-percent market penetration and a $10,000 average first run rental fee was not explained. The foreign television revenues were assumed to be 50 percent of the total U.S. commercial television revenues. Similarly, the only bases stated for the estimate of cable television revenues were that this medium was the fastest growing of any and that the revenues it would produce should almost equal revenues from commercial television. The basis for the estimate of

closed circuit television revenues was also stated to be the rate of growth of the medium.

The estimated revenues from the educational market were stated to result from the fact that Shakespeare's plays were well suited to the market and that there were more than 100,000 libraries, high schools, and junior and senior colleges to which videotapes, videodiscs, and motion picture films could be sold. The estimate of revenues from the sale of videotapes and videodiscs stated that this market should be sufficiently developed by late 1982 for Merry Wives to begin selling, and that by the end of 1985, revenues should equal $1.7 million. This estimate was based on 1 million videotapes and videodiscs being sold for a retail price of $15 to $20 each, and a royalty to the owner of 10 percent of the retail price.

The report consisted of two typed pages and did not estimate the fair market value of Merry Wives.

### Operating Results

During the years in issue, the partnerships reported the following losses on their partnership tax returns:

|      | 1979      | 1980      | 1981      |
|------|-----------|-----------|-----------|
| CFL  | $241,020  | $791,551  | $617,685  |
| GMS  | 120,677   | 881,243   | 468,981   |
| MWL  | - - -     | 479,978   | 583,125   |
| MBL  | - - -     | - - -     | 400,806   |

Distribution of Memoirs and Geppetto's returned income to their respective partnerships during the period 1979 through 1984 totaling $5,000 to $10,000. Distribution of Macbeth during the period 1981 through 1984 returned income to MBL totaling $3,000 to $4,000. Through 1984, MWL had not received any income from the distribution of Merry Wives.

During 1983 or 1984, each of the partnerships had fallen in arrears on minimum interest payments. While the notes provided that a default on minimum interest payments allowed the holder of the note to accelerate the partnerships' liability for the unpaid principal, such action had not been taken against any of the partnerships and Scheer did not intend to take such actions against the partnerships.

OPINION

## A. Economic Substance

The first issue for our consideration is whether the transactions between the partnerships, executive producers, and producers were tax shams lacking economic substance.

Transactions which are entered solely for the purpose of obtaining tax benefits and which are without economic substance are considered shams for Federal income tax purposes and will not be given effect. *Knetsch v. United States*, 364 U.S. 361 (1960); *Falsetti v. Commissioner*, 85 T.C. 332 (1985). The economic substance of a transaction, not its form, is controlling. *Gregory v. Helvering*, 293 U.S. 465 (1935). We have defined " 'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." *Falsetti v. Commissioner, supra* at 347. In *Falsetti*, we viewed the totality of facts and circumstances as establishing that a purported purchase of real property was in substance a sham. In determining that the purchase lacked the requisite economic substance, we took into consideration the absence of indicia of arm's-length dealing, drastically inflated sales prices, and a complete disregard of contractual terms.

Respondent contends that there was no justification for the partnerships' acquisitions of the videotapes other than expected tax benefits. Respondent alleges that prior to the transactions, petitioner failed to take the steps a prudent businessman would take prior to making a purchase for more than $2 million, and that his actions were those of a tax shelter promoter trying to document and substantiate transactions in the event of an Internal Revenue Service examination. Respondent further alleges that the purchase price was inflated and was the result of a lack of arm's-length negotiations, and that, if the notes failed to convert to nonrecourse by their maturity dates, the parties did not intend to enforce them.

Conversely, petitioner asserts that the structure of the purchases by the partnerships has economic substance in that the purchases were not motivated solely by tax-

avoidance purposes. The burden is upon petitioner to prove this assertion. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Petitioner must demonstrate that the purchases here in issue were in fact made with the intent of acquiring a profit-generating property for which notes would be executed and enforced in accordance with their terms. Absent such a showing, these transactions can be viewed as merely an attempt by the partnerships to obtain a $2.3 million depreciable tax basis ($2,320,000 in the case of MWL), yearly interest deductions for 7 years, and investment tax credits in exchange for the payment of $230,000 in year 1 ($250,000 for MWL and $270,000 for MBL) and a payment of $52,000 in each of the following 7 years.

We find that the purchases of the videotapes in this case were completely lacking in economic substance and cannot be recognized for Federal tax purposes. While our conclusion that these transactions were in substance shams is based on a careful review of the entire record, we find the following factors, taken together, to be particularly determinative in reaching this conclusion:

## 1. *Arm's-Length Dealings*

From the record, it is indisputable that the partnerships here involved did not attempt to negotiate for a purchase price which was less than the $2.3 million price ($2,320,000 in the case of MWL) set by Scheer. Petitioner has not argued to the contrary. Rather, petitioner argues that the purchase price for each of the videotapes was reasonably based on the costs of production as negotiated by Scheer.

We do not believe that petitioner attempted to determine, nor that he was capable of determining, whether the purchase prices were reasonable. Prior to becoming a general partner in the partnerships here involved, petitioner had no experience in the managing of a limited partnership, the production of videotapes, or the distribution of videotapes. The creation of tax-oriented investments for the financing of videotaped productions was an ongoing activity of Century and Solaris. Petitioner was brought into this activity solely because of his ability to obtain investors. Scheer controlled the structuring of the transactions, the choice of production arrangements, and the distribution of

the productions, while petitioner's involvement, other than obtaining investors in exchange for general partner's fees and sales commissions, was token.

Further, while petitioner claims that the purchase prices for the videotapes were based on "capitalizing" the estimated cash costs of production, the only preproduction cost estimates which have been offered as evidence were based on the use of deferred obligations to cover a large portion of the production costs. The Solaris cost estimates were prepared by taking the production order subcontract price and allocating it to the various cost categories by the use of "accountant's license." The cost estimates did not allocate any amount to Solaris' profit margin, even though the cost schedules prepared by Solaris after the productions were completed show that its profit margin was nearly $600,000 per production. The Solaris cost estimate for Memoirs and the Solaris and Century cost estimates for Geppetto's were each dated later than the dates upon which petitioner signed the acquisition agreements on behalf of the partnerships. In addition, even if petitioner had received estimates of the cash costs of the productions prior to executing the acquisition agreements, he could not have determined whether the estimates were reasonable without the aid of someone more experienced in the industry.

Even though he argues that such costs were the basis for each of the partnerships' $2.3 million purchases, there is no credible evidence in the record that petitioner attempted to independently determine what reasonable production costs for the videotapes would have been if based on the use of cash only. Further, petitioner's claim that $725,000 was a reasonable estimate of the cash cost of producing each of the videotapes is contradicted by respondent's expert on the production of videotapes, Adrian H. Joseph.[13] Joseph was president of Ultimate Video, Inc., a full service teleproduction company, and previously had 13 years of experience as a producer and associate producer of programming while employed by network-owned television stations. Joseph has

---

[13]Petitioner introduced the testimony of an expert witness, Warren Baker, on the subject of all cash production costs, but did not introduce an expert's report. Baker's testimony as to the all cash production costs was based on his view of what the production arrangements actually were as established by the evidence received at trial up to the time of his testimony. We find this testimony to be extremely speculative in nature and of little value.

also acted as a freelance producer and writer of television programs and video products. In his expert witness report, Joseph estimated reasonable budgets for the production of the videotapes here in issue at the times they were produced, including in each case a 15-percent contingency amount, to be as follows:

| Production | Budget |
| --- | --- |
| Memoirs | $222,846 |
| Geppetto's | 225,628 |
| Merry Wives | 17,877 |
| Macbeth | 371,605 |

In conjunction with this, we note that although two of the productions were 13-episode children's series and two were Shakespearean plays, and the record shows that their production arrangements differed substantially, the purchase price for each was virtually identical. This is clearly indicative of transactions that have been contorted to fit into a standardized tax model, rather than being structured to fit economic realities, and which are the result of a single individual's controlling both sides of the transactions.[14]

In sum, a close examination of the record reveals a complete lack of arm's-length dealing with respect to the contracts entered into by the partnerships, and we therefore do not believe that from an economic standpoint they can be relied on to accurately characterize the nature of the transactions here under consideration. See *Karme v. Commissioner*, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).

2. *The Partnership Notes*
   a. *Terms of the Notes*

Petitioner argues that the purchase price of each of the productions was predicated upon an estimated cash cost of $725,000 per production. Petitioner alleges that this was a reasonable estimate of the cash payment that would have been required to produce each of the productions without the use of deferred obligations.[15] Petitioner further alleges that the face amount of each of the notes executed by the

---

[14]See *Pittler v. Commissioner*, T.C. Memo. 1986-320.

[15]As we stated above, the record does not indicate that petitioner attempted to determine the reasonable costs of production prior to executing the acquisition agreements.

partnerships was determined by (1) subtracting the down-payment from $725,000 to determine the amount to be deferred, (2) calculating the future value of this deferred amount in 7 years using a 20-percent annual interest rate, and (3) increasing this future value by approximately 25 percent, as the executive producer's profit margin. For Memoirs, this calculation can be illustrated as follows:

Cash cost...................... $725,000
Amount deferred................ $725,000 − $230,000 = $495,000
Future value of amount deferred. $1.20^7 \times$ $495,000 = $1,773,585
Increased by 25 percent......... 1.25 $\times$ $1,773,585 = $2,216,981
Actual face amount of note........................... $2,070,000

Petitioner also alleges that at the time each of the partnerships entered into its acquisition agreement, an annual interest rate of 20 percent was reasonable.

Accepting, arguendo, petitioner's assertions that $725,000 was a reasonable estimate of the cash cost of each of the productions and that 20 percent was a reasonable interest rate, petitioner has completely ignored the effect of the 9 percent interest which was applied to the face amount of the notes. The result of applying a 9 percent interest rate to a principal amount determined by petitioner's method is the equivalent of paying an effective minimum annual interest rate of approximately 52 percent on the deferred portion of the cost of the production. Assuming an amount to be deferred of $1 and that the principal amount of the note remains unpaid until the end of the note's term, this can be illustrated as follows:

Amount deferred ......................$1
Future value of amount deferred........$1.20^7 \times $1 = $3.58
Effective annual interest ...............(0.09 $\times$ $3.58) + $0.20 = $0.52
Effective annual interest rate ..........52%

If principal is paid before the end of the note's term, the effective interest rate paid on the deferred portion of the production costs increases. In the extreme case, where the entire principal is paid in a lump sum at the end of the first year, the effective interest rate paid on the deferred portion of the production costs would be approximately 290 percent.

Using the same figures as above, this can be illustrated as follows:

Amount deferred ..................... $1
Face amount of note ................. $3.58
Payments made at end of year........ (0.09 × $3.58) + $3.58 = $3.90
Payments made in excess of
   amount deferred ................... $3.90 − $1 = $2.90
Effective interest rate............... 290%

In choosing the form of the notes that the partnerships would execute, Scheer set the principal amounts of the notes so as to create a 20-percent annual rate of return over 7 years absent any interest accruing on the principal. Scheer then, however, applied a 9-percent interest rate to the principal of the notes, resulting in the partnerships' being obligated to pay the equivalent of at least a 52-percent interest rate. We find it extremely difficult to believe that any investor would be willing to pay the equivalent of a 52-percent interest rate on an investment entered into for economic reasons. Petitioner has not, however, disputed any of the facts that would lead to the conclusion that if the nature of the transactions here involved are accurately characterized by the documents which have been drafted to substantiate them, petitioner and the other investors would be paying the equivalent of a minimum 52-percent interest on what they claim to be the deferred portion of the production costs. We find this, in conjunction with other indicia of mischaracterization, to suggest that the substance of the transactions here under consideration is neither accurately characterized by the documentation nor a product of economic considerations.

b. *Enforcement of the Notes*

While the notes executed by the partnerships had apparently not converted to nonrecourse as of the time of trial, the record in this case casts doubt on whether the parties intended to enforce the notes upon maturity. Because of the ongoing relationship of those within Century, Solaris, and Syntar, and their almost complete control of the form of the transactions here involved, evidence of the ability of someone not closely involved with Century, Solaris, or Syntar to enforce the partnership notes, either directly or indirectly,

would constitute strong evidence of the parties' intent to have the notes enforced.

As to Memoirs and Geppetto's, the cost schedule prepared by Solaris is very informative with respect to determining the parties who held the ultimate interests in the $2,070,000 partnership obligations. Syntar had a total deferred interest in each of the productions pursuant to its consulting and licensing agreements of $573,750. Solaris' profit margin for each production, which based on the evidence must have been a deferred interest, was $591,440. The deferred portion of Century's markup on the production order subcontract prices was approximately $570,000 for each of the productions. Therefore, more than $1.7 million (or more than 80 percent) of each of the CFL and GMS notes was ultimately obligated to either Century (or one of its wholly owned subsidiaries), Solaris or Syntar, and would not be enforced unless they chose to take action against the partnerships.[16]

With respect to MWL, the form of the transaction as set out in the production order subcontract was completely ignored. Rather than creating a single large obligation running from Bard I to SSA, an independent entity, much smaller obligations were executed by Bard I in favor of individuals involved in the production. Further, these obligations were not evidenced by notes for over 2 years after the completion of the videotaping of Merry Wives.

In the case of MBL, a production order subcontract was never executed and, similarly to the MWL transaction, small obligations were executed in favor of individuals rather than executing a single large obligation in favor of the production company. This included the execution of notes by Bard II in favor of regular employees of the production company as compensation for their services as employees of the production company. More significantly, the first set of notes executed by Bard II clearly stated that amounts in excess of a pro rata portion of MBL's minimum interest payments would only be paid out of revenues from distribution. There is also testimony in the record indicating that

---

[16]The record does not clearly show how much of the balance of the CFL and GMS notes might also have been ultimately obligated to Century, Solaris, or Syntar.

this was the understanding of individuals who received notes with respect to both Merry Wives and Macbeth.

We also note that rather than have Century or Bard incur obligations to other parties based upon the partnerships' obligations, Scheer chose to interpose new corporations, funded with only $1,000 and created solely for this purpose, between each of the partnerships and any third party obligees. While this might not prevent a third party from reaching the partnership's obligation, it clearly has the potential of hindering such a party from doing so, especially where such party's claim is relatively small.

In sum, the record convincingly shows that the face amount of each of the notes was drastically inflated beyond an economically justifiable amount when considered in reference to the interest provisions of the note. The record also casts doubt on whether the parties intended to enforce the notes in accordance with their terms. These facts are further evidence that the transactions here under consideration were not structured with the intent of conforming to economic realities but rather were entered in order to obtain tax benefits.

### 3. *The Offering Memoranda*

The offering memoranda uniformly failed to make any representations about the fair market values of the video-tapes or the income streams which could be expected to result from exploitation of the videotapes. Each of the memoranda, however, devoted in excess of 14 pages to the tax aspects of investment in the partnerships. In fact, the most direct statement made in the memoranda concerning the benefits which could be expected to result from an investment in the partnerships was "that the relative financial benefit of an investment in the partnership will generally depend substantially on the tax bracket of the investor." In addition, the portion of the memoranda which explained the requirement that the limited partners assume liability for a pro rata portion of the partnership notes was part of the section of the memoranda which explained the "at risk" rules. Sec. 465. The memoranda also noted as risk factors the lack of experience of almost everyone involved

with the management of the partnerships, the production of the videotapes, and the distribution of the videotapes.

Viewing each of the memoranda as a whole, it is unfathomable that a reasonable person could believe that there was a basis for investing in the partnerships other than for the acquisition of tax benefits.

### 4. *Appraisals Received by Petitioner*

Merry Wives was the only production which petitioner had reviewed by an appraiser prior to entering into the acquisition agreement for the production. Because petitioner chose not to have Eliscu, the preparer of the appraisal report, testify as to his credentials and background, the report was offered at trial solely for the purpose of showing petitioner's due diligence in investigating the purchase of the videotape, and not as proof of the value of the videotape. The appraisal report, however, fails to show due diligence on the part of petitioner.

The report's explanation of the $5.1 million revenue projection is insufficient to justify reliance on it by any prudent investor. The stated basis consisted of vague assertions about market penetration and market growth, unsupported by relevant statistics or comparison to the results of similar productions. While purportedly relied on to justify a more than $2 million purchase, the report was only two pages and did not estimate the fair market value of the videotape. Further, petitioner has not alleged that the report was made available to investors, or potential investors, in MWL as a representation of the likely performance of the investment. We believe this to be indicative of petitioner's confidence in the report.

### 5. *Appraisals Prepared for Trial*

Respondent offered the reports and testimony of two experts who examined the four productions here under consideration. Respondent's expert James A. Sowards estimated the fair market values of each of the productions as of the dates that the acquisition agreement for each was executed. Sowards determined the following fair market values:

| Production | Value as of— | Value |
|------------|--------------|-------|
| Memoirs | 10/04/79 | $179,728 |
| Geppetto's | 10/04/79 | 179,728 |
| Merry Wives | 12/31/80 | 152,755 |
| Macbeth | 10/21/81 | 152,755 |

Respondent's expert A. Frank Reel also valued each of the productions as of the acquisition dates. Reel determined the following fair market values:

| Production | Value as of— | Value range |
|------------|--------------|-------------|
| Memoirs | October 1979 | $97,500 to $130,000 |
| Geppetto's | October 1979 | 130,000 to 162,500 |
| Merry Wives | December 1980 | 26,000 to 32,000 |
| Macbeth | October 1981 | 25,000 to 35,000 |

Petitioner's expert on distribution of video products, Raymond Markman, testified as to the revenues that could be generated by the productions during the 5-year period following trial. Markman testified that each of the children's series could generate $4 million in wholesale home video revenues and $1 million in television revenues over the 5-year period. Markman testified that the Shakespearean plays would each produce $10 million in wholesale revenues over the 5-year period.

In evaluating the testimony of Markman, it is difficult not to reflect back on the performance of the productions and of the partnerships up to the time of trial. During the distribution periods prior to 1984, which ranged from 3 to 5 years for each production, the productions returned the following amounts of income to their respective partnerships:

| Production | Total income |
|------------|--------------|
| Memoirs | $5,000 to $10,000 |
| Geppetto's | 5,000 to 10,000 |
| Merry Wives | 0 |
| Macbeth | 3,000 to 4,000 |

During the years in issue, the partnerships generated the following tax losses:

| Partnership | Years | Total tax losses |
|-------------|-------|------------------|
| CFL | 1979 to 1981 | $1,650,256 |
| GMS | 1979 to 1981 | 1,470,901 |
| MWL | 1980 to 1981 | 1,063,103 |
| MBL | 1981 | 400,806 |

Nonetheless, we believe that it is unnecessary for us to attempt to resolve the conflicts which exist between the opinions of the experts and between these opinions and other evidence which has been presented. Petitioner has admitted to facts which clearly establish that the prices paid for the videotapes were substantially inflated. The record unambiguously shows that the terms of the purchases were the result of a complete lack of arm's-length dealings and that Scheer possessed control of the structuring of the transactions and the ongoing operation of the partnership. The record also calls into doubt whether the parties intended to enforce their agreements in accordance with the terms set out therein. The totality of facts and circumstances establish that the purchase transactions here in issue were in substance shams lacking economic significance beyond expected tax benefits. *Falsetti v. Commissioner*, 85 T.C. 332 (1985).

Accordingly, it is unnecessary for us to reach the remaining issues other than the applicability of section 6621(d).

### B. Section 6621(d)

By an amendment to answer, respondent has raised the applicability of section 6621(d) to the portion of the underpayments attributable to the partnerships' basis overstatements.[17]

Section 6621(d) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $1,000) attributable to a tax-motivated transaction.[18] Section 6621(d)(3)(A) enumerates types of transactions which are to be considered "tax motivated transactions." These transactions include "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(d)(3)(A)(i). A valuation overstatement, within the mean-

---

[17]In his amended answer, respondent also raised the applicability of sec. 6621(d) to any portion of the underpayment attributable to "any loss disallowed by reason of section 465(a)." Sec. 6621(d)(3)(A)(ii). We did not reach the applicability of sec. 465(a) in this case, and because of respondent's failure to brief the applicability of sec. 6621(d), we will not consider its application beyond the narrowest scope raised in his amended answer.

[18]The provision is applicable to transactions entered into prior to its enactment, but the additional interest only accrues after Dec. 31, 1984. *Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986).

ing of section 6659(c), has occurred "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)."

Each of the partnerships here in issue claimed a basis in depreciable purchased property of $2.3 million ($2,320,000 in the case of MWL) and claimed deductions and investment tax credits as a result. Our holding that each of the purchases was in substance a sham is also a determination that each partnership's correct basis in the property was zero. As such, a valuation overstatement within the meaning of section 6659(c) has occurred to the extent of the full basis claimed by each of the partnerships, and the underpayments which are attributable to all deductions and credits resulting from the claim of basis in the purchased property are attributable to tax-motivated transactions. *Zirker v. Commissioner*, 87 T.C. 970 (1986). Further, for each of the years in issue, the underpayment resulting from petitioner's share of such deductions and credits is in excess of $1,000 and is therefore a "substantial underpayment." Application of the rate provided by section 6621(d) shall be made in the amount of the substantial underpayment determined pursuant to Rule 155 in accordance with Temporary Regulation section 301.6621-2T, Proced. & Admin. Regs., 49 Fed. Reg. 50391 (1984).

Accordingly, in order that the parties may calculate the portion of the underpayment to which section 6621(d) is applicable for each year in issue,

*Decisions will be entered under Rule 155.*