LESLIE H. KJOS AND ESTATE OF LILLIAN E. KJOS, DECEASED, RANDALL L. KJOS, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kjos v. Commissioner
Docket No. 14254-84.
United States Tax Court
T.C. Memo 1987-183; 1987 Tax Ct. Memo LEXIS 179; 53 T.C.M. (CCH) 525; T.C.M. (RIA) 87183; April 6, 1987. *179 Joseph W. Wiegel, for the petitioners. Sheldon M. Kay, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Deficiency
1980
$20,495.15
1981
13,059.00
Following concessions by the parties, the only issue for decision is whether petitioners are entitled to deductions resulting from their investment in MBR, Ltd.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of the petition in this case, petitioner Leslie Kjos resided in Kalispell, Montana. Lillian E. Kjos died in May 1981. The Estate of Lillian Kjos, Randall Kjos, personal representative, is a Montana estate. Petitioner Leslie Kjos made an election to file joint Federal income tax returns on behalf of himself and his deceased wife for the taxable years 1980 and 1981. On December 23, 1980, petitioner Leslie Kjos (petitioner) purchased an interest in MBR, Ltd. (MBR). [1]MBR was formed as an Indiana limited *180 partnership to acquire a 90-minute videotaped children's program entitled "Sherlock and Me." The purchase price set by the parties was $2,300,000, consisting of a cash down payment of $230,000 and financing in the amount of $2,070,000. The seller of the videotape was Video Gems, Inc. (Video Gems), a corporation formed in 1979. The financing for the purchase was provided by Video Gems. The unpaid principal balance plus interest accruing at 9 percent per annum was due on March 31, 1987. MBR, however, was required to assign 80 percent of gross receipts from the exploitation of the videotape to Video Gems until the debt was paid in full. Also, the purchase note required the payment of minimum annual interest of $40,000. Each limited partner in MBR was required to execute an assumption agreement by which he would assume liability to make contributions to the partnership, on a pro rata basis, as necessary to allow the partnership to make any required payments on the debt to Video Gems. This liability was limited to a pro rata portion of the annual minimum interest *181 payments during the first seven years and a pro rata portion of the balance remaining on the debt when it became due. The amount of the liability was to be decreased by any principal or interest payments made out of revenues of the partnership. Donald Richards (Richards) was the general partner of MBR and was responsible for all aspects of the partnership's operations. Richards is a certified public accountant with no experience in the production, distribution, or exploitation of children's television programming. Richards had also been petitioner's accountant. The offering memorandum used to market interests in MBR stated, under the heading "SUITABILITY STANDARDS FOR INVESTORS," that "the relative financial benefit of an investment in the Partnership will generally depend substantially on the tax bracket of the investor." A large portion of the offering memorandum is devoted to a discussion of the tax aspects involved in holding a limited partnership interest in MBR. Included are discussions of the "at-risk" provisions of the Internal Revenue Code, the potential tax exposure if the Internal Revenue Service determines that the purchase price of the videotape was inflated, and *182 various depreciation methods. Video Gems was the executive producer of Sherlock and Me. Leslie Lagoni was the president and founder of Video Gems. Solaris International Pictures, Inc. (Solaris) was the producer of Sherlock and Me and Solaris International Distributors, Inc. (SID), a wholly owned subsidiary of Solaris, was the exclusive distributor of Sherlock and Me. Leslie Lagoni had been president of Solaris until 1979. Neither Solaris nor SID had previous experience distributing television programs. The only television showing of Sherlock and Me was in late 1979 on channel 3 of Theta Cable Television (Theta Cable) in Los Angeles, California. Theta Cable channel 3 is a public access station which will play any videotape without charge if the videotape is neither illegal nor obscene. Late in December of 1979, a representative of Solaris brought a group of videotapes, including Sherlock and Me, to Theta Cable. The representative of Solaris told Theta Cable personnel that these videotapes had to be played before the end of the year for tax reasons. The Theta Cable station manager told the Solaris representative that the bulk of the videotapes would be played between midnight *183 and very early in the morning. The Solaris representative did not request that Sherlock and Me be played at a time when children would be likely to be watching. Sherlock and Me was shown on December 29, 1979 and December 30, 1979. Solaris paid Theta Cable $200 per hour to put the videotapes, including Sherlock and Me, on channel 3 in 1979. For the years 1979 through 1983, the reported income, claimed depreciation, and claimed losses of MBR were as follows: Year
Gross Income [2]
Depreciation
Claimed Losses
1979
$41.98 $328,286 $329,254.57 1980
40.39
580,285
599,913.20
1981
29.41
236,429
277,302.06
1982
1.87
182,000
222,212.26
1983
0
182,000
222,473.78
Through at least the end of 1983, no portion of the principal amount of the purchase price note had been paid. OPINION The tax shelter presented in this case is very similar to those dealt with in Helba v. Commissioner,87 T.C. 983 (1986). In fact, other than changes with respect to some of the parties involved and the size and number of units offered, the offering memorandum *184 for MBR appears to be the same used by several of the partnerships in that case. Further, the purchase price and cash down payment in this case are identical to those in two of the four offerings discussed in Helba and are very close to the other two offerings discussed in that case. We find this to be somewhat peculiar considering that the four offerings in that case consisted of two 13 episode children's series and two Shakespearean plays. We noted in Helba that the virtually identical purchase prices for offerings which were very different in nature was in itself suspicious. 87 T.C. at 1007. In Helba, we determined that the investments therein were entered into at severely inflated prices and were the product of non-arm's length dealings. We concluded that such investments were wholly without economic substance and did not entitle their investors to any tax benefits. 87 T.C. at 1014. In this case, only one expert witness testified as to the fair market value of the videotape of Sherlock and Me. A. Frank Reel (Reel) was called upon to testify at trial and presented an expert report with respect to the fair market value of the videotape. *185 Reel determined that if the videotape was improved by editing out the live portions and making a series of one-half hour animated shows, the value of the videotape would be between $1,500 and $2,500. Reel considered the videotape to be unsalable in the form in which they had been purchased. Richard Bennett (Bennett), a limited partner in MBR and an accounting client of Richards, the general partner of MBR, testified at trial that at the time he was considering the investment, Richards had told him that he would not have to pay any amount on the purchase obligation to Video Gems because the partnership held a "forgiveness note" from Video Gems. Richards assured Bennett that the full amount of the purchase obligation would never become due. Bennett had informed Richards that he could not afford to lose the more than $200,000 he was obligated for pursuant to the assumption agreement. There is little in this case to distinguish it from Helba v. Commissioner,supra. Perhaps the only elements of this case which distinguish it are the testimony of Bennett and Reel. Their testimony demonstrates, even more than was apparent from the facts found in Helba, that *186 this tax shelter was formed for the sole purpose of obtaining tax benefits without any consideration of economics and that the terms of this "investment" were not intended to be honored. In our recent opinion in Rose v. Commissioner 88 T.C.     (Feb. 5, 1987), we enumerated characteristics which are common to generic tax shelters: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. [Slip op. at p.40.] In such cases, the question becomes whether sufficient business purpose exists for the taxpayer to be entitled to tax benefits from the transaction. Rose v. Commissioner,supra.
In this case, the tax benefits were the focus of the promotional materials and *187 the investors must have accepted the terms of purchase without price negotiation, as the price was inflated to almost 1,000 its apparent market value. We are not sure that the package of rights acquired in this case was difficult to value. We are sure that such rights were greatly overvalued. Finally, the promissory notes in this case were at best nonrecourse in substance. These notes may well have had no substance. There has been no showing of any business purpose behind this investment. This transaction is clearly devoid of economic substance as was the transaction in Rose.
We find that this case cannot be meaningfully distinguished from Helba v. Commissioner,supra, except that the facts of this case are perhaps more clearly adverse to petitioners. Accordingly, we hold that petitioners are not entitled to any deductions as a result of their participation in MBR. Decision will be entered under Rule 155.
Footnotes
1. A subscription agreement and certificate of limited partnership interest were both executed on December 23, 1980.↩
2. All amounts reported as gross income were interest received by MBR.↩