CARL R. TASSISTRO AND DIANA M. TASSISTRO, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Tassistro v. Commissioner
Docket Nos. 18600-82, 18257-83, 19907-83, 29877-83.
United States Tax Court
T.C. Memo 1987-192; 1987 Tax Ct. Memo LEXIS 194; 53 T.C.M. (CCH) 582; T.C.M. (RIA) 87192; April 13, 1987. Henry W. Walther and John D. Humbert, for the petitioners. Marc J. Winter, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Docket
Addition to Tax
Petitioner
Number
Year
Deficiency
Section 6653(a) [2]
Carl R. and Diana
18600-82
1975
$975
M. Tassistro
1978
12,208
Donald and Susan
18257-83
1979
17,789
Fagin
1980
11,161
1981
8,092
Jeannette K.
19907-83
1975
2,894
145
Howell
1976
3,027
151
1978
3,596
179
1979
3,601
180
1980
3,595
180
Felice Perez-
29877-83
1979
3,259
Pena
1980
2,584
*196 The issues for decision are: (1) Whether petitioners are entitled to depreciation, miscellaneous deductions, and investment tax credits with respect to their interests in certain videotapes; (2) Whether petitioners are entitled to deduct interest paid on certain notes used in the purchase of their interests in the videotapes; (3) Whether there were substantial underpayments in petitioners' taxes in the years in issue which are attributable to tax motivated transactions within the meaning of section 6621(c), Tax Reform Act of 1986 [formerly section 6621(d)]; and (4) Whether petitioner Jeanette K. Howell is liable for an addition to tax for negligence under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioners Carl R. Tassistro ("Tassistro") and his wife, Diana M. Tassistro, resided in *197 San Juan Capistrano, California at the time they filed their petition. During 1978, Tassistro was a physician, and his wife was a nurse and housewife. Petitioners Donald Fagin ("Fagin") and his wife Susan Fagin, resided in Sudbury, Massachusetts at the time they filed their petition. During 1979 through 1981, Fagin was vice-president of sales for a computer company, and his wife was a student. Petitioner Jeanette K. Howell ("Howell") resided in Yorba Linda, California when she filed her petition. During 1975 through 1980, Howell was a school teacher. Petitioner Felice Perez-Pena ("Pena") resided in West Covina, California at the time she filed her petition. During 1979 and 1980, she too was a school teacher. Background of Videotapes
Tassistro, Fagin, Howell, and Pena each bought an interest in different videotapes. Each tape contained a single episode from one of two series known as "Magic Star Traveler" ("Magic") and "Fantasy Theatre" ("Fantasy"). Each series was produced and each episode was filmed by Solaris International Pictures, Inc. ("Solaris" or the" producer"). The financing for each series was arranged by Century Video Corporation ("Century" or the *198 "executive producer"). Century was formed by Lawrence Scheer ("Scheer") in 1977 to act as the executive producer of television products. Prior to this, Scheer had been in the life insurance business for 25 years and had no experience in television or home video production, or in the marketing or distribution of videotapes. Solaris was formed in 1977 to act as the producer of television products. Throughout the years under consideration it was controlled by Glenn Taylor ("Taylor"). During such period Taylor also controlled and was the sole stockholder of Syntar Productions, Inc. ("Syntar"), another production company which was formed in 1976. At times Taylor provided production services to Solaris through contracts between Solaris and Syntar. In late 1977, Scheer met with Taylor to discuss the possible production of a series of videotapes to be offered for sale in the childrens market. Shortly thereafter, Taylor agreed to have Solaris create a series of half-hour programs for children. Scheer agreed to have Century provide the financing for the programs by selling them to investors. At this time Scheer did not know and made no serious investigation of the financial, business, *199 or professional reputation of either Taylor or Solaris before entering into the agreement. Financing Structure
Under the arrangement between Century and Solaris, Century acquired each videotape from Solaris pursuant to a production order or contract, and paid for the videotape with some cash and a deferred obligation for the balance of the purchase price. Century would then attempt to sell the videotape (or in some cases an undivided interest in the videotape) to an investor [3] pursuant to an owner's contract, and, if successful, the investor would pay for the videotape with some cash and a deferred obligation in the form of a convertible note. The investor's note provided that its principle was due at the end of seven years with "recourse". Interest was payable annually. The note also provided that it could be converted to a nonrecourse note upon maturity for an additional seven years if certain conditions were met. [4]
*200 Under a typical contract between Century and Solaris for the production of a half-hour episode, Century owed Solaris a total of $73,000, payable $7,000 in cash and the balance of $66,000 in seven years plus interest at the rate of 7 percent per annum. The contract further provided that Century's $7,000 down payment was to be paid out of the larger down payment which would be received by Century from an investor under its corresponding owner's contract and the balance of $66,000 was payable by Century from 75 percent of the proceeds actually received by Century under the owner's contract. The Solaris-Century contract also provided that if Century was not in default at the end of the seven-year term, and the underlying owner's contract was not in default and had been extended for an additional seven-year term, Century was entitled to extend its contract with Solaris for an additional seven-year term. A typical contract for a Magic one-hour [5] episode, required Century to pay Solaris a total of $118,450, of which $10,450 was due when the contract was executed and the balance of $108,000 was payable at the end of seven years. Interest only at the rate of 7 percent per annum was *201 payable during the seven-year term. In all other respects a contract for a one-hour episode was identical to a contract for a half-hour episode. In a typical owner's contract between Century and an investor, the total price of a half-hour episode of either Magic or Fantasy was $100,000 and the total price of a one-hour episode of Magic was $160,000. The $100,000 for a half-hour episode was payable $12,000 in cash at the time of purchase, and the balance of $88,000 was represented by a note payable at the end of a seven-year term with interest at 7 percent being payable annually. [6] The $160,000 for a one-hour episode of Magic was payable $16,000 in cash at the time of the purchase, and the balance of $144,000 was represented by a note payable at the end of a seven-year term, with interest at 7 percent interest payable annually. *202 The amount of the investor's note was determined by Solaris and Century as follows. First, Taylor gave Scheer an estimate of how much it would cost to produce each episode (the "production cost"). Scheer accepted the estimate without any negotiation or investigation. The amount of the investor's note was then calculated in the following manner: (1) the investor's cash down payment was subtracted from the estimated total production cost; (2) the balance of the cost was "capitalized" at an annual interest rate of approximately 20 percent for seven years; and (3) this capitalized amount was increased by approximately 25 percent, in order to provide Century with a profit. At a meeting in Century's office in March 1982, Scheer told a group of prospective investors that the financing structure on a one-hour episode was designed to achieve for the investor tax write-offs of $135,000 over a seven-year period [7] in return for approximately $22,000 (down payment and interest). He also stated that at end of the seventh year, the investor's note would become nonrecourse, and as a result, the investor could if he desired, default at that time on the note and surrender the videotape to Century *203 and end the matter except for the recapture of any depreciation or investment credit previously claimed on the tape by the investor. Therefore, according to Scheer, the minimum net result for the investor would be the deferral of a substantial amount of income tax for seven years. Petitioners' Purchases
Prior to 1978 Tassistro, like all the other petitioners, had no experience in the production or sale of television or home video products. However, in December 1978, he purchased a 50 percent interest in a Magic episode after learning about the tapes from Robert Linden, an attorney, investment counselor, and personal friend. Tassistro also had read some promotional literature provided by Century. The promotional literature focused primarily on the tax benefits to be derived from purchasing an episode and the projected future expansion of the production and sale of VCR's. The literature contained no sales or income projections with respect to Magic or Fantasy, in particular, or children's videotapes, in general. Prior to *204 his purchase, Tassistro did not talk to anyone from Solaris or Century and did not attempt to investigate their backgrounds. Instead he relied on the advice of Linden, although he was aware that Linden had no experience in the production or sale of such products. He was also aware that Linden was entitled to a commission on any sale to Tassistro. The tape in which Tassistro acquired an interest was chosen for him by Linden, and neither Tassistro nor Linden viewed the tape before the purchase or sought an independent appraisal of its value. Howell purchased an interest in a Magic episode in December 1978. She first learned about the tapes from a counselor at her school. She then visited Solaris' office where she was given a tour of its studio by Leonard Francoeur, the president of Century. She also read Century's promotional literature but she made no attempt to investigate the backgrounds of Francoeur, Solaris or Century or to obtain an appraisal of the value of the tape or its actual cost. Howell had no part in choosing her tape. It was assigned to her by Francoeur. Perez purchased an interest in a Fantasy episode in 1979. She first learned of the tapes from a presentation *205 made at her school by Century. Thereafter she read Century's promotional literature. Relying almost exclusively on the opinion of two other teachers at her school who had no experience in the production or sale of such products, Perez did not investigate the background of Solaris and made only a few general inquiries with respect to Century. She too did not select her tape. It was chosen for her by Century. Fagin purchased an interest in a Fantasy episode in 1979. He learned about the tapes from James Helba, his financial planner. Prior to his purchase, Fagin read Century's promotional literature and visited Solaris' studios. He also discussed the tapes with an executive at Twentieth Century Fox, but was advised that the executive had never heard of either Solaris or Century. With the exception of the above, Fagin did not investigate the viability of his purchase. He delegated all these responsibilities to Helba. Helba, however, had no experience in 1979 in the production or sale of tapes and made little effort, if any, to talk to anyone not connected with Solaris or Century. In addition, he made approximately twenty sales of tapes for Century, including the sale to Fagin, *206 and received a commission on each sale. Helba also was the general partner in several partnerships that financed tapes produced by Solaris and Century or their subsidiaries. See Helba v. Commissioner,87 T.C. 983 (1986). Each of the petitioners made a cash down payment on his or her interest in the tape and executed a seven-year recourse note which was convertible to nonrecourse at maturity. Tassistro, Pena, and Howell made yearly payments of interest on their notes, but Fagin did not make any of his interest payments until a short time before trial. Production of the Tapes
The Magic series consisted of episodes in which a ventriloquist and his puppets would "visit" various places and discuss what they saw. Actually, Solaris merely filmed the ventriloquist and the puppets talking on a stage in front of films of scenes which were purportedly being visited. There were no scripts. The ventriloquist merely ad-libbed his lines with the assistance of communications from a director which were given to the ventriloquist during the tapings by means of a hidden microphone. The background footage for the original episodes was obtained at no cost by Solaris *207 from travel agencies, airlines, and other such sources. When these sources were exhausted Solaris was able to obtain the right to use as background excerpts from several animal films in the series known as the "Last of the Wild." Films from other series were also used as background footage. The 84 episodes of Magic were filmed by Glen Taylor of Solaris during October, November, and December of 1978. The original ventriloquist had agreed to do two shows a day, but within a few weeks after production began, Taylor was taping five shows a day. Since the original ventriloquist could not work at this pace he was discharged and a new ventriloquist was hired. Consequently the earlier shows had to be redone. By the end of the series, Taylor was taping six or seven shows a day, with emphasis on quantity rather than quality. About the end of November 1978, Taylor asked Bill Jones, one of the writers for the Magic series, to create a concept for Fantasy another series of programs for children. The concept, as developed by Jones and adopted for the Fantasy series, consisted of Jones, dressed and made up as a leprechaun, telling fairy tales to a talking harp. Within two weeks, the series *208 was in production and during December approximately 85 episodes were filmed although Jones had originally agreed to do only 13. Approximately half of the episodes filmed as part of the Fantasy series were sold to a party other than Century and were distributed under the name of "Enchanted Storybook" but Scheer was not aware of this and thought Century had acquired all of the episodes in existence. At or about the end of December 1978, Solaris ceased production and discharged most of its employees. Distribution of the Tapes
Shortly after purchasing interests in the tapes, petitioners joined in the appointment of Richton Marketing Services ("Richton") as an agent to locate distributors for the tapes. For these services Richton charged an initial sign-up fee of between $28.00 and $100.00 per tape plus 5 percent of its gross income after deducting distribution costs. Petitioners also joined in the appointment of Master Media Syndicators ("Master Media") as the distributor of their tapes in the home television market. For these services Master Media was paid $125.00 per tape as an initial sign-up fee and was entitled to the receipt of 50 percent of the gross income from *209 the tapes in such market. Both Richton and Master Media were owned by Richard Minken, who had begun distributing television programs in 1976 or 1977, while he was involved with two sports shows. Prior to the time his companies were appointed distributing agents for petitioners' tapes neither he nor the companies had been engaged in the production or distribution of programs for children. Minken obtained petitioners' names from Solaris and initiated the contacts with petitioners, and none of petitioners or their advisors made any attempt to investigate the background or experience of Minken or his companies before signing the appointment contracts. In 1979 Minken acting on behalf of petitioners and their co-owners, gave Visual Concepts, Inc. a non-exclusive license to home video rights in their tapes, but this license did not produce any revenues for the investors. In that same year Solaris, without Minken's knowledge, paid a cable television station in Los Angeles to show some of the episodes. In March 1980, Minken transferred his companies' right to distribute the tapes to D.W. Marketing Corp. ("DW Marketing"), a newly formed company of Robert Davis and Robert Williams. Davis *210 was Scheer's first cousin. Prior to 1979 he had been in the insurance business and had no experience with television products. Prior to becoming petitioners' agent, Davis had sold several tapes on a commission basis for Solaris, but had no other experience in the television industry. Although they were requested to and did appoint D.W. Marketing as their new agent, none of petitioners knew, or attempted to learn, anything about D.W. Marketing at that time. Over the next three years, DW Marketing executed distribution contracts on behalf of petitioners, with several distributors who in turn were unsuccessful in their attempt to sell the episodes to television stations or other video outlets. One of these distribution contracts was with Joseph Green Film Enterprises, Inc., which sold a few episodes, but petitioners did not receive any revenue from these sales. DW Marketing also entered into a distribution contract with Telepictures Corporation ("Telepictures") under which Telepictures had the right to distribute the tapes in all foreign television and home video markets. Scheer negotiated this contract, which gave Telepictures 30 percent of the gross receipts from such markets. *211 Some episodes were sold and Telepictures paid DW Marketing a percentage of the receipts from the sales, but petitioners received nothing. Other distribution contracts included one which gave Century Home Video (CHV), another company owned by Scheer, an exclusive license in the home video market. Scheer also negotiated a contract with Cinaco Television Company ("Cinaco"), which gave Cinaco an exclusive license in the home television market. Up to the date of trial neither CHV nor Cinaco had made any sales in their respective markets. DW Marketing ceased to act as petitioners' agent in 1983 because it was not making any money, but petitioners were not informed that it had ceased to be their agent. At the trial date, petitioners had no agent, although some distribution contracts were still in effect. However, petitioners had not received any income from their tapes. Petitioners' Returns
On his 1979 return, Tassistro claimed a loss of $12,312 with respect to the interest in his tape. Most of the loss was generated by a depreciation deduction while the remainder was for in-home-office expenses. In 1978 Tassistro also claimed an investment tax credit with respect to *212 the tape which was carried back in part to 1975. On his 1979, 1980, and 1981 returns, Fagin claimed losses related to his tape of $16,000, $21,000, and $15,750, respectively, all of which were generated by depreciation deductions. He also claimed an investment tax credit with respect to the tape on his 1979 return. On her 1978, 1979, and 1980 returns, Howell claimed losses with respect to the interest in her tape in the amounts of $2,000, $12,182, and $11,949, respectively. These losses were generated by deductions for depreciation, interest, and miscellaneous expenses. In 1978 Howell also claimed an investment tax credit which was carried back in part to 1975 and 1976. On her 1979 and 1980 returns, Pena claimed losses related to her tape in the amounts of $8,790 and $7,701, respectively. These losses were generated by deductions for depreciation, commissions, and interest. She also claimed an investment tax credit on her 1979 return. In separate statutory notices, respondent disallowed the losses and credits claimed by petitioners. In Howell's notice respondent asserted an addition to tax for negligence under section 6653(a) for each year in issue. In his answers respondent *213 claims that all petitioners are liable under section 6621(c) for additional interest accruing on their deficiencies after December 31, 1984. OPINION I. Deductions for Depreciation and Miscellaneous Expenses and Investment Tax Credits
Respondent contends that petitioners are not entitled to depreciation deductions under section 167, miscellaneous expense deductions under section 162 or 212, or investment tax credits under section 38 because petitioners' transactions with respect to the videotapes lacked economic substance and such activities were not engaged in by petitioners for profit. We recently held, in Rose v. Commissioner, 88 T.C.     (February 5, 1987), that in the case of a "generic tax shelter" it is preferable to merge the two theories advanced by respondent in this case into a single theory which focuses on whether or not certain objective factors indicate that the disputed transactions had economic substance. There we defined a generic tax shelter as being a program involving the following characteristics: (1) tax benefits are the principal focus of promotional materials used in the program; (2) the price and terms of purchase are accepted by the investors *214 with little or no negotiation; (3) the asset in question consists of a package of purported rights, difficult to value in the abstract and substantially overvalued in relation to any tangible property included in the package; (4) the tangible property is acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration is deferred by promissory notes, nonrecourse in form or substance. 88 T.C. at     (slip opinion at p. 40). Since petitioners' investments in the videotapes clearly involved, at least to some extent, all of the above characteristics, we must determine whether there was economic substance in their transactions. Therefore, we will examine the dealings between the parties to the transactions in order to see if such dealings tend to show an actual profit objective on the part of petitioners, the relationship between the purchase price of the tapes and their fair market value, and the structure of the financing used in the transactions. For the reasons set forth hereinafter our analysis of the transactions in the light of the above factors leads us to the conclusion that the transactions were devoid *215 of economic substance. A. The Dealings Between Century, Solaris, and Petitioners
It is clear that the dealings between Century, Solaris, and petitioners evidence a complete lack of actual profit objective on the part of petitioners. To begin with, they purchased their interests in the tapes without having any idea of the value of the tapes and without making any attempt to ascertain their value. Furthermore, petitioners did not know the price, if any, at which the tapes would sell, how long it would take to sell them or their quality. In fact, petitioners did not view their tapes before purchasing them and the only projection they received was a schedule of tax savings provided by Century. [8]
Moreover, neither petitioners nor their advisors made any serious inquiry into the backgrounds of Scheer, Solaris, and Century, who not only produced the tapes but determined their purchase price without any negotiation by or for petitioners. *216 Century accepted at face value the estimates of production costs made by Solaris, and using such estimates as a starting point Century and Solaris determined an ultimate price to be paid by petitioners, who played no role in the process. The conduct of petitioners after the tapes were purchased further reflect their indifference to a profit. They joined in the appointment of Minken and his companies as agents to distribute the tapes without knowing or attempting to learn anything about Minken, and they later accepted without question DW Marketing, which had no experience in the industry as Minken's replacement. The record before us contains no evidence that any of the petitioners ever made any effort to insure that they were being represented by competent distributors intent on producing revenues, and by the date of trial they no longer had an agent. From the above, it is not surprising that petitioners had no receipts from their interest in the tapes and incurred nothing but losses, because it is evident that they did not have an actual profit objective. B. Relationship between Sales Price and Fair Market Value
Although the record contains little evidence concerning *217 the fair market value, if any, of the tapes at the time of purchase, we have no difficulty in finding that petitioners paid drastically inflated purchase prices in view of the manner in which the prices were determined. The price of a tape was initially based on the production cost estimated by Solaris, but the production cost was never substantiated by Solaris. In any event, the relatively small down payment the investor was required to pay was deducted from the estimated production cost and the balance of such cost was deferred by means of a note. However, the principal amount of the note was calculated by capitalizing the deferred amount for a period of 7 years (the term of the note) using an annual interest rate of approximately 20 percent and then increasing the result by approximately 25 percent, for Century's "profit margin." As a final absurdity the principal thus calculated was subject to interest at 7 percent per annum. The end result of these convoluted calculations was that petitioners and similar investors were required to pay an effective minimum annual interest rate of approximately 45 percent on the deferred portion of the estimated production cost of their tapes. *218 See Helba v. Commissioner,supra.
With the incredible interest rate described above as well as the inflated profit margin provided for Century, it is apparent that the total purchase prices which petitioners agreed to pay greatly exceeded any possible but undisclosed value for their interests in the tapes. C. Structure of the Financing
The presence of deferred debt that is not likely to be paid is also an indication of lack of economic substance. See, e.g., Tolwinsky v. Commissioner,86 T.C. 1009 (1986); Waddell v. Commissioner,86 T.C. 848 (1986); Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F. 2d 652 (2d Cir. 1986); Golsen v. Commissioner,54 T.C. 742, 753-754 (1970), affd. 445 F. 2d 985 (10th Cir. 1971); Karme v. Commissioner,73 T.C. 1163, 1186-1187 (1980), affd. 673 F. 2d 1062 (9th Cir. 1982); Knetsch v. United States,364 U.S. 361 (1960). In the case before us, petitioners' notes were labeled "recourse" but in substance the notes were nonrecourse since only interest and no principal payments *219 were required until maturity, at which time the notes were convertible to nonrecourse. Furthermore, we are convinced that (as stated by Scheer during at least one of his presentations to prospective investors) Century never intended to collect the principal amount of the notes and at maturity, and before paying any principal, petitioners could have surrendered their interest in the tapes and been relieved of any further liability. Since we have found that the principal amounts of the notes were in fact nonrecourse, their principal amounts were highly inflated in relation to the value of the tapes, and the payee of the notes did not intend to enforce payment of the principal, we are forced to conclude that the principal amounts of the notes were not likely to be paid by petitioners. From the above analysis of the activities of the parties, the manner in which the purchase prices were calculated, and the underlying financing structures, we are satisfied that the transactions at issue were devoid of economic substance and do not qualify as a proper basis for depreciation deductions, miscellaneous deductions, and investment tax credits claimed by petitioners. II. Interest Paid *220 on Notes
Our finding that the transactions under consideration lacked economic substance does not in itself preclude petitioners from claiming deductions under section 163 for interest actually paid on a genuine indebtedness. See Rice's Toyota World, Inc. v. Commissioner,752 F. 2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983); Rose v. Commissioner,supra.However, we have also concluded that the principal amounts of the notes were nonrecourse, unreasonably exceeded the value of petitioners' interests in the tapes, and their payment was highly unlikely. The notes, therefore, did not constitute genuine indebtedness, and petitioners are not entitled to deduct any interest paid thereon. See Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F. 2d 1441 (2d Cir. 1984), affd. sub nom., Barnard v. Commissioner,731 F. 2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Krasta v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F. 2d 5, 6-7, 9 (3d Cir. 1984). *221 III. Section 6621(c)
By amendments to his answers, respondent has raised the applicability of section 6621(c) to that portion of any substantial underpayments of tax by petitioners which is attributable to overstatements on their returns of the value of property or their basis in property. Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (an underpayment in excess of $1,000) which is attributable to a tax motivated transaction. [9] Section 6621(c)(3)(A) enumerates the type of transactions which are to be considered as "tax motivated." These transactions include "any valuation overstatement (within the meaning of section 6659(c))." Section 6621(c)(3)(A)(i). A valuation overstatement, within the meaning of section 6659(c), has occurred "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." *222 On their returns each petitioner reported a basis in depreciable property (an interest in a videotape) of between $33,000 and $100,000 and with respect to such property claimed depreciation deductions and investment tax credits. Our conclusion that each petitioner's transactions with respect to such property were devoid of economic substance and are to be disregarded for tax purposes also constitutes a determination that each petitioner's correct basis in the property for computing depreciation deductions and investment tax credits is zero. See Rose v. Commissioner, 88 T.C.     (Feb. 5, 1987); Zirker v. Commissioner,87 T.C. 970 (1986). Consequently, a valuation overstatement within the meaning of section 6659(c) has occurred to the extent of the basis claimed in the property by each petitioner, and any underpayment of tax which is attributable to any deduction or credit resulting from the overstated basis in the property is attributable to a tax motivated transaction. See Rose v. Commissioner,supra; Zirker v. Commissioner,supra.Further, for each of the years in issue, the underpayment in tax of each petitioner resulting *223 from such deductions and credits is in excess of $1,000 and is a substantial underpayment under section 6621(c). Each petitioner, therefore, is liable for the additional interest provided by section 6621(c), as determined pursuant to Rule 155 and in accordance with Temporary Regulation section 301.6621-2T, Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). IV. Section 6653(a)
Respondent's determination that petitioner Howell is liable for the addition to tax for negligence under section 6653(a) is presumptively correct and the burden of proving that the determination is erroneous is upon Howell. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). On this record we find that Howell has failed to carry her burden and, therefore, respondent's determination is correct. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Donald Fagin and Susan Fagin, docket No. 18257-83; Jeannette K. Howell, docket No. 19907-83; and Felice D. Perez-Pena, docket No. 29877-83.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
3. For convenience, the term investor in the singular as used hereinafter shall refer to the purchaser of an entire videotape or an undivided interest in such a tape. ↩
4. Those conditions were: (a) Owner has made all payments of minimum interest due to CV [Century] on a timely basis; (b) The Owner has, for a period of at least seven (7) years, exercised his or its best efforts to exploit his or its tapes for profit. Said "best efforts" shall require either the active direct participation of the Owner in substantial efforts to sell the right to exhibit his or its tapes, or to obtain a distribution agreement based on a non-exclusive license to a recognized distributor or syndicator of television programs who will undertake at its own substantial expense efforts to sell the right to exhibit the television programs embodied in the tape or tapes, to television stations and for use by airline companies, hotels and motels, and other multiple users. In the event that the Owner does not wish to personally expend the time necessary to perform said minimum efforts, Owner will hire and direct the activities of any employee or agent who will undertake to exercise such efforts. The Owner will, however, supervise such efforts, and in the event they are unsatisfactory, will discharge the employee or agent, and seek other employees or agents. In the event that the Owner has not made any payments on account of principal on the unpaid balance of the debt due CV, by the end of the third year of the debt, the Owner will make at least ten sample videocassettes for sale or lease, and advertise them, at a reasonable market mark-up in publications in which such videocassettes are advertised for sale or lease. The Owner or his or its employee or agent shall take such other and further action as from time to time, with the development of the videorecorder, videodisc, and videoplayer industry appear to the Owner to be reasonable and proper, for the purpose of seeking profits in the videocassette and videodisc markets, in a substantial effort to earn profits from the sale or leasing of the Owner's television program in vodeocassettes or videodiscs. (c) At least one of the following events has occurred within the term of the note. (i) The achievement from sales or leasing or licensing of the right to exhibit the Owner's television program or from sales of videotapes or videodiscs, of gross earnings sufficient so that the Owner's share thereof as applied by the requirements of its Agreement will have paid all interest, plus a minimum of one-half of the principal balance due hereunder; or (ii) The non-exclusive licensing of a television program distributor or syndicator who has had gross receipts in excess of four million dollars per year from the distribution of television programs, or the right to exhibit television programs, for at least three years next preceding the year of such licensing, and the undertaking by such distributor or syndicator to attempt to distribute the Owner's television programs at its own substantial expense, on terms with regard to repayment of its distribution fees normally payable to the distributor as its share of exhibition fees paid by television stations, airlines, hotels or motels, etc.; or (iii) the achievement of sales to the public in the videorecorder, videotape player or videodisc player industry or unites by which a videocassette or videodisc can be played in private or in residences (just as record albums are played in private or in residences) totaling not less than two million units in the aggregate. (d) The Owner applies to CV for said conversion of his or its debt and agrees to continue his or its best efforts, as set forth above, to exploit the tapes for profit, and for the purpose of making payments on the unpaid balance of the debt herein for such additional reasonable period of time as may be requested by the Producer. (Jt. Exs. 13-M, 14-N, 15-O; 16-P)↩
5. From the record before us, it appears that a Magic one-hour episode was merely two half-hour episodes. The Fantasy series was limited to half-hour episodes and had no one-hour episodes.↩
6. Where undivided percentage interests were acquired by more than one investor in a videotape the total price, down payment and deferred balance for each investor's interest was determined by his percent of the total of each of these items.↩
7. This seven-year period would begin on the date the tape was purchased and would span all or part of each of the succeeding eight tax years.↩
8. Petitioners produced at trial a ledger sheet containing very general estimates of projected income, but we are unable to determine from the record before us when or by whom the ledger sheet was prepared or who, if anyone, relied on it.↩
9. Section 6621(c) is applicable to transactions entered into prior to its enactment, but the additional interest only accrues after December 31, 1984. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F. 2d 1005↩ (2d Cir. 1986).